No. 92,010

STATE OF KANSAS, *Appellee*, v. NATHANIEL BELL, *Appellant*.

(121 P.3d 972)

Opinion filed October 28, 2005.

*Randall L. Hodgkinson*, deputy appellate defender, argued the cause and was on the briefs for appellant.

*David Lowden*, assistant district attorney, argued the cause, and *Debra S. Byrd Peterson*, deputy district attorney, *Nola Foulston*, district attorney, and *Phill Kline*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Nathaniel Bell appeals his jury conviction of one count of premeditated first-degree murder.

Nathaniel Bell, who was 19 years old in April 2003, was planning to leave Wichita in early May to go into the Job Corps, and in the meantime he was staying at the apartment of Adam Lopez. Jose

Felix was Lopez' roommate. Duane Williams and Gregorio Cervantes were friends of Bell, Lopez, and Felix.

Bell slept until 6 p.m. the evening of Wednesday, April 23, 2003. About 7 p.m., Bell, Williams, and Cervantes went out to buy Coricidin, a cold remedy. Back at Lopez' apartment, they took a number of Coricidin tablets, drank beer, and, when they began to feel some effect from the tablets, each snorted a line of cocaine approximately 1½ inches long. Bell described the effect as making him feel "disconnected," but keeping him alert, upbeat, calm, and relaxed.

Lopez did not participate in the drug activities. He went to bed before midnight and slept heavily.

When Felix returned home from work between 1:30 and 2 a.m., Bell, Williams, and Cervantes were sitting in a car in the apartment parking lot drinking beer and talking. Felix joined them. Felix and Bell had a conversation about the fight they had had on Tuesday, and Bell apologized.

Lopez testified that there was friction between Felix and Bell. The specific incident on Tuesday occurred in the bedroom of Lopez' apartment. Bell said that he had been in the bedroom crying about leaving Wichita, job, friends, and family. Felix came into the room and made a comment that Bell did not like. The two engaged in a physical fight until their friends came into the bedroom and pulled them apart. After the fight had been broken up, Bell expressed the opinion that Felix was ungrateful and said that Felix did not know what he had coming.

After talking in the car about their fight, Felix and Bell seemed to have resolved the issue. They were joking and seemed to be having a good time. Williams, Cervantes, Felix, and Bell went up to the apartment. Felix laid on the couch and dozed off. Bell sat down next to him on the couch. Cervantes sat in the chair, and Williams sat on its arm. The apartment was lit by a strobe light, and there was music playing.

Cervantes got a knife from the kitchen. After removing the child-safety device on his cigarette lighter, he jokingly pretended to stab the sleeping Felix in the leg. They all laughed, and then, when Bell asked for the knife, Cervantes gave it to him.

Later Bell got on top of Felix, straddling him. Bell whispered in Felix' ear, kissed his neck and chest, and massaged his genitals. Bell testified that his initial intention was to pull a practical joke on Felix by jumping on him and startling him, but instead he began a sexual seduction.

As Williams and Cervantes were talking, Williams heard Felix saying to Bell, "Please don't do it." Williams turned and saw Bell with his hands gripping the knife above his head and starting to bring it down to thrust into Felix. Felix's hands were at his side in a nonthreatening way. Then Williams heard gasps, gurgles, and sounds of Felix trying to breathe. Felix either fell or was pushed by Bell onto the floor. Felix became quiet. Bell changed his clothes, took the keys to Felix's car and Lopez's cell phone, pulled a blanket over Felix's body, and left the apartment.

After leaving the apartment Cervantes and Williams went to the police station to report what they had witnessed. Bell left the apartment and drove around trying to find his friends. When Williams received a call from Bell, Williams got Bell's location for police. Within a short time, he was arrested.

Although Bell was asked directly about self-defense during a lengthy interview with police the following day, he denied being attacked. At trial, he testified that Felix tried to push him off, reached for a bottle on the floor, and battled for the knife. Bell testified that, after he stabbed Felix, Felix got the knife, got on top of him, and tried to stab him. According to Bell, the second two stab wounds to Felix were inflicted as Bell defended himself: Bell pushed Felix off, stabbing Felix in the process. Felix fell on the floor. When Bell got down to check on Felix, Felix grabbed Bell's hair and slammed his head on the floor. Felix tried to hit Bell with the bottle, Bell blocked the hit with the knife in his hand so that the force of Felix's arm drove the knife blade into Felix's neck.

The crime scene investigator found a kitchen knife with an 8¼ inch blade under the end table. He found no bottles within Felix's reach.

Bell first contends that his statement made during police interrogation should have been suppressed as involuntary.

During a videotaped police interrogation, Bell told police that he stabbed Felix, he intended to stab Felix, and his motivation was to stop Felix from coming between himself and Cervantes. Bell alleged that it was involuntary because he was under the influence of alcohol and drugs and he was given only a bottle of water during the hours-long interrogation. The trial court did not agree, and the videotape of Bell's interview was played for the jury.

At a hearing on the motion to suppress, Bell testified that he was 19 years of age at the time of the interrogation. He testified that he was feeling the effects of drugs and alcohol while he was being interrogated. He had consumed 16 Coricidin tablets, beer, and a 2-inch line of cocaine before midnight on April 23.

His interview began about 8:30 the morning of April 24. Bell said that during the interview he felt "disordered," which he described as "[l]ike when you're there and you know what you're doing, but you don't know what you're doing . . . ." He testified that his vision, off and on, would be blurry. With regard to his hearing, Bell testified that it was "like all the words is running together at the same time for a little bit." But, when that happened, he would ask to have the question rephrased and then he would understand it. He remembered signing forms at the police station and testified that no threats, coercion, or promises were made to make him sign. When no one was in the room with him, he was "sleepy and dizzy and stuff."

At the hearing, Bell testified about his activities between the time he stabbed Felix and his arrest at shortly before 6 a.m. on April 24. Bell testified that he changed his clothes before leaving Lopez' apartment. He drove Felix's car, and he made calls on Lopez' cell phone. Bell agreed that he consumed only one "very small line of cocaine," but he stated that Coricidin makes the effect of cocaine last longer.

The trial judge announced his reasoning for admitting Bell's statement immediately before the trial began, stating:

"During the [video]tape whenever he was alone in the room, Mr. Bell certainly appeared tired. He laid his head down on the desk for long periods of time, especially when he was left in the room. I never really noticed him doing that when the officers or detectives were present, but anytime he was alone in the

room he laid his head down on the desk or table and certainly appeared tired. Whether that was from a combination of alcohol and drugs or physical fatigue or emotional distress or for some other cause is unknown, but what he physically did is obvious on the tape.

"Whenever the detectives or officers came in the room, whether it was for the oral swabs, for a restroom break or to conduct the interviews or for whatever other times they had contact with Mr. Bell, Mr. Bell was certainly alert, if not energetic. I don't think he was ever energetic, but certainly he was alert. Anytime the officers and/or detectives were asking him questions, his answers were appropriate and responsive to those questions. His answers provided discreet information, sometimes including Social Security numbers, names, addresses and other specific detailed information. I do find that Mr. Bell, at least during the interview portions, was alert, oriented and responsive to the questions.

". . . His demeanor present on the tape — and granted, the audio quality of the tape isn't great, but the demeanor he showed on the tape had a low voice, a quiet non-emotional demeanor and a pattern of slow speech, but I'll also note that that wasn't that much different than his demeanor in the courtroom on Friday when he testified [at the hearing on his motion to suppress.] Mr. Bell talks in a low, soft voice. He talks slowly deliberately, and he sure didn't show much emotion on Friday and he didn't show much emotion on the tape.

"Based on the review of the tape and based on the testimony of Detective Fatkin, I find that Mr. Bell was aware and oriented at the time of his interviews, that his answers were appropriate in the interviews, that he was in the custody of the police and physically in interview room number one for a period of time of approximately nine and a half hours but neither from his testimony nor from the tape nor from Detective Fatkin's testimony was there any apparent emotional or physical distress. He was showing no overt or readily apparent effects. He, Mr. Bell, was not showing any overt or apparent effects of alcohol or drugs or both.

"Under the totality of the circumstances that I have to review such motions under, I find that Mr. Bell did understand the Miranda warnings that he was given. I find he understood and appreciated the situation he was in and the gravity of his being given rights in that situation. I find that his waiver of those rights was knowingly, intelligently, voluntarily and freely made. I'll deny the motion to suppress and I'll allow the admission of the statements pursuant to the *Jackson v. Denno* hearing. I do find the statement was voluntary and his waiver of the rights was knowingly, intelligently and voluntarily made."

In reviewing a trial court's decision regarding the suppression of a confession, an appellate court reviews the factual underpinnings of the decision by a substantial competent evidence standard and the ultimate legal conclusion by a de novo standard. In determining whether a confession is voluntary, a court is to look at the totality of the circumstances, including the duration and manner of the

interrogation; the ability of the accused on request to communicate with the outside world; the accused's age, intellect, and background; and the fairness of the officers in conducting the interrogation. The essential inquiry in determining the voluntariness of a statement is whether the statement was the product of the free and independent will of the accused. *State v. Swanigan*, 279 Kan. 18, Syl. ¶¶ 1, 2, 106 P.3d 39 (2005). This court does not reweigh evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence. *State v. Mays*, 277 Kan. 359, 372, 85 P.3d 1208 (2004). The State bears the burden of proving that a defendant's confession is voluntary and therefore admissible by a preponderance of the evidence. 277 Kan. at 373.

On appeal, Bell's principal contention is that his consumption of alcohol and drugs the evening before his interrogation affected the voluntariness of his statement. He concedes that an accused's use of alcohol and drugs does not per se establish involuntariness. *State v. Sweat*, 30 Kan. App. 2d 756, 763, 48 P.3d 8 (2002). But he argues that being under the influence of alcohol and drugs, combined with his fatigue, the length of time he was kept in the interrogation room, and the lack of food, all contributed to a totality of circumstances that rendered his statement involuntary.

The trial judge's factual findings are supported by substantial competent evidence. With regard to his ingestion of alcohol and drugs, Bell testified he had consumed 16 Coricidin tablets, beer, and a 2-inch line of cocaine before midnight on April 23. He was arrested shortly before 6 a.m. on April 24, and his interview began at approximately 8:30 a.m. More than 8 hours elapsed between Bell's ingesting any alcohol or drugs and his interview. Bell stated his opinion that the effects of cocaine last longer than usual when it is taken with Coricidin, but he did not testify that what lingering effects he felt—feeling somewhat "disordered," occasional blurred vision, and occasional trouble hearing—curtailed the exercise of his free and independent will. With regard to his occasional hearing difficulty, Bell testified that he simply asked to have a question rephrased and then would understand it. With regard to his feeling "disordered," examination of the videotape bears out the trial judge's finding that Bell was alert, oriented, and responsive to the

questions and was not showing overt or apparent effects of alcohol and drugs.

As the trial judge noted, the videotape shows Bell resting his head on the table when he was alone in the interrogation room but becoming alert when another person entered the room. Moreover, the trial judge noted that Bell's demeanor in the interview room was quite similar to his demeanor in the courtroom, which would indicate that it was his customary demeanor in an unfamiliar setting.

The trial judge took into account the length of time Bell was in the interview room in police custody—approximately 9½ hours—but found no signs of Bell's suffering emotional or physical distress as a consequence. In this regard, the trial judge considered Bell's testimony, the videotape, and Detective Fatkin's testimony. Review of this evidence shows that it is substantial and competent and supports the factual finding.

Based on his factual findings, the trial judge concluded that Bell's statement was knowing, voluntary, and intelligent in the totality of the circumstances. The factual findings underpinning the trial court's conclusion are supported by substantial competent evidence. We conclude that the trial court did not err in admitting Bell's statement into evidence.

Bell next contends that the trial court erred in giving Instruction 11. Instruction 11 states:

"In determining whether the defendant is guilty of murder in the second degree, you should also consider the lesser offense of voluntary manslaughter. Voluntary manslaughter is an intentional killing done upon a sudden quarrel or in the heat of passion or upon an unreasonable but honest belief that circumstances existed that justified deadly force in defense of a person.

"If you decide the defendant intentionally killed Jose Felix, but that it was done upon a sudden quarrel or in the heat of passion or upon an unreasonable but honest belief that circumstances existed that justified deadly force in defense of a person, the defendant may be convicted of voluntary manslaughter only."

He concedes that defense counsel did not object to Instruction 11 and contends that a clearly erroneous standard of review applies. No party may assign as error the giving or failure to give an instruction, including a lesser included crime instruction, unless the party

objects, distinctly stating the matter objected to and the grounds for the objection before the jury retires, unless the instruction is clearly erroneous. K.S.A. 2004 Supp. 22-3414(3). Instructions are clearly erroneous only if the reviewing court is firmly convinced there is a real possibility that the jury would have rendered a different verdict if the error had not occurred. *State v. Davis*, 275 Kan. 107, 115, 61 P.3d 701 (2003).

The State agrees that the standard of review is clearly erroneous, but adds that Instruction 11 was among the instructions proposed by the defendant. The court reviews an alleged error in the jury instructions by a clearly erroneous standard where the party neither objected nor requested a remedial change. See *State v. Pabst*, 273 Kan. 658, 660, 44 P.3d 1230, *cert. denied* 537 U.S. 959 (2002). Since Bell requested Instruction 11, he cannot now argue that it was clearly erroneous. Although that would normally end our inquiry, we do not find Instruction 11 erroneous and feel we should set out our reasons for so finding.

Bell complains that Instruction 11 was erroneous because the jurors were not allowed to consider the mitigating circumstances that would reduce the offense from murder in the first degree to manslaughter. Instruction 11 is PIK Crim. 3d 56.05(B), which, according to the Notes on Use, is to be used when voluntary manslaughter is submitted to the jury as a lesser offense of the crime charged. Bell was charged with first-degree premeditated murder. In addition to the charged offense, the jury was instructed on murder in the second degree intentional, voluntary manslaughter, and involuntary manslaughter.

Bell mistakenly believes that Instruction 11 presents the same error that required reversal of the conviction in *State v. Graham*, 275 Kan. 831, 69 P.3d 563 (2003). Graham was charged with attempted first-degree murder. The trial court gave PIK Crim. 3d 56.05(A) rather than (B). 56.05(A) is for use when the information *charges* voluntary manslaughter. Because there was some evidence in *Graham* of heat of passion or sudden quarrel, the defendant was entitled to have the jury consider such evidence *during its consideration of the elements of attempted second-degree murder.* (Emphasis added.) 275 Kan. at 839. But the erroneous instruction "de-

prived Graham of the opportunity to have the jury consider mitigating circumstances which might have reduced attempted second-degree murder to attempted voluntary manslaughter." 275 Kan. at 840. Thus, the court concluded that there was a real possibility the jury would have rendered a different verdict with proper instruction.

In the present case, Bell was charged with first-degree murder and the jury was instructed on voluntary manslaughter as a lesser offense. Avoiding the error made by the trial court in *Graham*, the trial court in the present case correctly gave PIK Crim. 3d 56.05(B) rather than (A).

Bell, however, argues that Instruction 11 is erroneous because, even though it allowed the jury to consider circumstances that might reduce second-degree murder to voluntary manslaughter, it did not allow the jury to consider those circumstances for the purpose of reducing premeditated first-degree murder to a lesser offense. The circumstances Bell has in mind are heat of passion or what he calls "imperfect self-defense," and the basic premise of his argument is that either heat of passion or an honest but unreasonable reliance on self-defense would reduce first-degree murder to a lesser offense.

With regard to heat of passion, Bell is simply wrong. In *State v. Hurt*, 278 Kan. 676, 683, 101 P.3d 1249 (2004), the court stated that, although second-degree murder is reduced to voluntary manslaughter if it is committed in the heat of passion, "[t]he same is not true of premeditated first-degree murder. Premeditation and heat of passion are mutually exclusive concepts. In other words, if a murder was premeditated, it cannot have been the result of heat of passion."

The doctrine of imperfect self-defense is codified in K.S.A. 21-3403(b), which provides that voluntary manslaughter is the intentional killing of a human being committed "upon an unreasonable but honest belief that circumstances existed that justified deadly force under K.S.A. 21-3211, 21-3212, or 21-3213 and amendments thereto." In *State v. Ordway*, 261 Kan. 776, 787-88, 934 P.2d 94 (1997), the court explained the provision's history:

"Legislative history of K.S.A. 21-3403 shows that the definition of voluntary manslaughter was expanded by the addition of subsection (b) in 1992. L.1992, ch. 298, § 5. Until then, the statute defined voluntary manslaughter as an intentional killing upon a sudden quarrel or in the heat of passion. Notes on proposed criminal code revisions were attached to the minutes of the Senate Judiciary Committee from March 22, 1992, which contained the following comments about subsection (b) of 21-3403:

'(b) "Imperfect right to self-defense" manslaughter

'This new subsection covers intentional killings that result from an unreasonable but honest belief that deadly force was justified in self-defense. In essence, the defendant meets the subjective, but not the objective, test for self-defense. This so-called "imperfect right to self-defense" is recognized in various forms. Kansas apparently recognizes it for unintentional killings under involuntary manslaughter. *State v. Gregory*, 218 Kan. 180[, 542 P.2d 1051] (1975); *State v. Warren*, 5 Kan. App. 2d 754[, 624 P.2d 476, *rev. denied* 229 Kan. 671] (1981) *State v. Meyers*, 245 Kan. 471[, 781 P.2d 700] (1989). The Model Penal Code also follows this approach. Some states, *e.g.* Illinois, recognize this partial defense for intentional killings. See, LaFave, Criminal Law, pp. 665-666 (1986).' "

Thus, the jury was properly instructed that intentional second-degree murder might be reduced to voluntary manslaughter if committed with an honest but unreasonable belief that circumstances justified the use of deadly force in self-defense. But premeditated first-degree murder would not be reduced by an honest but unreasonable reliance on self-defense because, as with premeditation and heat of passion, the two are mutually exclusive concepts. If a murder were committed with premeditation, it would not be the result of an unreasonable but honest belief that circumstances justified deadly force. Premeditation requires reason; imperfect self-defense requires the absence of reason.

We conclude that Instruction 11 is not erroneous.

Finally, Bell contends that he was denied a fair trial by the prosecutor's misstatements of fact and law.

In *State v. Tosh*, 278 Kan. 83, Syl. ¶¶ 1, 2, 91 P.3d 1204 (2004), the court described the analysis applicable to questions of prosecutorial misconduct:

"A two-step analysis is applied to allegations of prosecutorial misconduct. First, the court decides whether the prosecutor's comments were outside the wide latitude allowed in discussing the evidence. Second, the court must decide whether the comments constitute plain error, that is, whether the statements prejudiced the jury against the defendant and deny him or her a fair trial, thereby requiring

reversal. The second step is a particularized harmlessness inquiry for prosecutorial misconduct cases."

"In the second step of the two-step analysis for alleged prosecutorial misconduct the appellate court considers three factors to determine if the prosecutorial misconduct so prejudiced the jury against the defendant that a new trial should be granted: (1) whether the misconduct is gross and flagrant; (2) whether the misconduct shows ill will on the prosecutor's part; and (3) whether the evidence against the defendant is of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors. None of these three factors is individually controlling. Before the third factor can ever override the first two factors, an appellate court must be able to say that the harmlessness tests of both K.S.A. 60-261 and *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967), have been met."

Bell complains that the prosecutor misstated a fact relevant to his theory of self-defense by stating in closing argument: "Did anybody tell you that there was a beer bottle, no, nobody did." Defense counsel ended closing argument with the following remarks:

"It's uncontroverted Nate stabbed Jose on the 24th of April. It's the reasons why. Again, ladies and gentlemen, this is a young person that had never been in circumstances like this before, had never been in a fight before, and this behavior happened under circumstances of drugs, alcohol and in an environment which is affecting his ability to conceive what's going on. Under his perception of what happened, he felt that his life was in danger, that he was going to be struck and that Jose had his hand around his neck and a beer bottle in his hand ready to strike him. That's what he saw."

In rebuttal, the prosecutor noted that during more than 9 hours in police custody for interrogation Bell said nothing about a beer bottle. The prosecutor also noted that the first law enforcement officer on the scene testified that he saw no beer bottles within arm's reach of the decedent. Then, after reviewing the taped statements of Cervantes and Williams and the testimony of Lopez, the prosecutor stated: "Did anybody tell you that there was a beer bottle, no, nobody did."

In arguing that the prosecutor misstated the evidence, Bell directs the court's attention to Cervantes' trial testimony. Cervantes testified that he saw a beer bottle in Felix's hand:

"Q. What did Nate tell you after you saw him with the knife in his hand?
"A. He told me that he was trying to protect himself because Jose tried to hit him with a bottle.

"Q. Did you see a bottle in Jose's hand as he lay on the floor?
"A. Yes.
"Q. And that bottle would still be there because you didn't move it. Right?
"A. Yes.
"Q. And that bottle would be in pictures law enforcement took. Correct?
"A. Yes."

The State's position seems to be that Cervantes' testimony was not credible and, for that reason, points out that none of the pictures taken by officers at the scene show a bottle in Felix's hand. Examination of photographs in the record on appeal confirm the State's assertion.

The State correctly points out that the part of closing argument complained of by Bell was preceded by the prosecutor's referring to the taped statements given by Cervantes and Williams rather than to trial testimony. But the statement at issue seems to refer to testimony given before the jury — "Did anybody tell *you* that there was a beer bottle, no, nobody did." (Emphasis added.) If the prosecutor's statement was not limited to the taped statements of Cervantes and Williams, and it does not appear to be so limited, it misstated the evidence. Even if, as the State urges, Cervantes' trial testimony about a bottle in Felix's hand was questionably credible, the prosecutor cannot misrepresent that testimony without exceeding the wide latitude allowed in discussing the evidence.

Thus, we must consider the following three factors to determine if the prosecutorial misconduct so prejudiced the jury against the defendant that a new trial should be granted: (1) whether the misconduct is gross and flagrant; (2) whether the misconduct shows ill will on the prosecutor's part; and (3) whether the evidence against the defendant is of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors. Here, Bell does not even assert that the prosecutor's statement was gross and flagrant. Nor does Bell contend that it shows ill will on the prosecutor's part. Bell's concern is that the jury was "deflected" from a proper consideration of the applicable facts. With the evidence against Bell being direct and overwhelming, the misstatement would likely have little weight in the jurors'

minds. We conclude the misstatement of fact did not so prejudice Bell that he should be granted a new trial.

Also in the rebuttal portion of closing argument, the prosecutor made the following remarks about Bell's voluntary intoxication: "Is this intoxication to the effect that he can't think about what's going on. *Is it so great that it overcame his ability to think.*" (Emphasis added.) Bell contends that the second sentence misstates the law regarding voluntary intoxication.

K.S.A. 21-3208(2) provides:

"An act committed while in a state of voluntary intoxication is not less criminal by reason thereof, but when a particular intent or other state of mind is a necessary element to constitute a particular crime, the fact of intoxication may be taken into consideration in determining such intent or state of mind."

The jury was instructed, according to PIK Crim. 3d 54.12-A, that "[v]oluntary intoxication may be a defense to the charge of first degree murder, where the evidence indicates that such intoxication impaired a defendant's mental faculties to the extent that he was incapable of forming the necessary state of mind of premeditation and the intent to kill." The jury was further instructed, according to PIK Crim. 3d 54.12-A-1 that voluntary intoxication may be a defense to the charges of second-degree murder and voluntary manslaughter "where the evidence indicates that such intoxication impaired a defendant's mental faculties to the extent that he was incapable of forming the necessary intent to kill."

In support of his argument that the prosecutor's remark in closing argument misstated the law, Bell cites *State v. Walker*, 252 Kan. 279, 296-97, 845 P.2d 1 (1993), where an instruction, rather than a remark, on voluntary intoxication was at issue. The complained-of instruction in *Walker* was given in addition to the pattern instruction. It stated in part:

"[I]n the case of certain crimes called specific intent crimes, if the jury believes from all the facts and circumstances that defendant was intoxicated, and that the intoxication was to such a degree that defendant's mental faculties were impaired, and that such impairment was to such an extent that the defendant was incapable of forming the specific intent which is an element of the crime, that is, if the defendant *'was utterly devoid of consciousness or awareness'* of what he was doing

then the jury may take that fact into consideration in determining whether or not such intent or state of mind existed." 252 Kan. at 296.

The court disapproved of the italicized phrase, but concluded "that no reversible error has been shown." 252 Kan. at 297.

Bell urges the court to find that the prosecutor's questioning in closing argument whether his intoxication was "so great that it overcame his ability to think" is comparable to the *Walker* instruction and to conclude that there is reversible error in the present case. However, there was no reversible error in *Walker,* hence, even if we disapproved the remark and determined that it is comparable to the instruction, *Walker* is not authority for finding reversible error in the present case.

In the two-step analysis applied to allegations of prosecutorial misconduct, we first decide whether the prosecutor's remark was outside the wide latitude allowed. The defendant's intoxication being "so great that it overcame his ability to think" is not an accurate statement of the law of voluntary intoxication, which is specific to the inability to form the necessary state of mind or intent. A misstatement of the law by a prosecutor lies outside the latitude allowed. In *State v. Holmes*, 272 Kan. 491, 499-500, 33 P.3d 856 (2001), the prosecutor's deliberate misstatement of the law was considered to be outside permissible latitude.

In the second step, "[e]ach case must be scrutinized on its particular facts to determine whether prosecutorial misconduct is harmless error or plain error when viewed in the light of the trial record as a whole." *State v. McCorkendale*, 267 Kan. 263, Syl. ¶ 9, 979 P.2d 1239 (1999). In *McCorkendale,* the court considered the following remarks on intoxication, which were made by the prosecutor in closing argument: "[In order for you, the jurors, to find that voluntary intoxication is] a defense to first degree murder, you have to think that he was totally out of it because he was drinking, he wasn't aware of what was going on in his surroundings." 267 Kan. at 284. As in the present case, there was no contention in *McCorkendale* "that the trial court improperly instructed the jury on voluntary intoxication. The court's instructions provided the correct legal standard for the jury and constituted a correct

statement of Kansas law." 267 Kan. at 284. Even so, the defendant argued that the State's argument on the law of voluntary intoxication required reversal. The court stated:

"[I]n order to credit the defendant's argument, we must assume that the jury did not follow the instructions given by the trial court. There is simply no basis in the record to establish that the jury in this case did not follow the trial court's instructions. While we agree that the remarks of the State were an incorrect statement of the law on involuntary intoxication and constitute error, we conclude beyond a reasonable doubt that such remarks had little, if any, likelihood of changing the result of the trial." 267 Kan. at 284.

In the present case, too, the jury was correctly instructed so that there is little, if any, likelihood that the prosecutor's incorrect statement about intoxication had any effect on the result of the trial. We conclude that *McCorkendale* is controlling and, although the remarks were improper, they did not deny Bell a fair trial.

Affirmed.

LOCKETT, J., Retired, assigned.