## MODIFIED OPINION

No. 95,335 [1]

STATE OF KANSAS, *Appellee,* v. VICTOR ANDRE CARTER, *Appellant.*
(160 P.3d 457)

Original opinion filed June 8, 2007. Modified opinion filed June 22, 2007

*Michelle A. Davis*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Ellen H. Mitchell*, county attorney, argued the cause, and *Phill Kline*, attorney general, was with her on the briefs for appellee.

The opinion of the court was delivered by

BEIER, J.: In this appeal from his convictions for first-degree murder, aggravated assault, and criminal possession of a firearm, defendant Victor A. Carter claims that the district court erred by denying a continuance to enable proof of his theory of defense; refusing to allow defense counsel to withdraw; and failing to instruct jurors they should consider imperfect self-defense as they deliberated on first-degree murder. He also argues that the prosecutor committed reversible misconduct; challenges the admission of a photograph; and questions the propriety of giving an *Allen*-type instruction. See *Allen v. United States*, 164 U.S. 492, 41 L. Ed. 2d 528, 17 S. Ct. 154 (1896). Finally, he also alleges the jury instructions on the order of deliberations were erroneous and asserts that even if no single error compels reversal, cumulative error does.

### Facts

Victim Darryl Revels was killed when he was hit at close range by a shotgun blast to his abdomen. Salina police responded to the scene, the living room of a house where Carter was living, and talked to a neighbor. The neighbor told them she had heard the shot and had then seen Carter walk out of the front of the house.

Revels was a bodyguard of sorts for Carter. He would do household chores and would screen visitors who came to do money and drug deals and other illegal transactions with Carter.

On the night of the crime, William Gardenhire came over to the house to help Revels set up stereo equipment for Carter. Several other people also were at the house: Carter, Carl Christiansen, James Armstrong, Lori Harris, Christopher Williams, Twayne Bledsoe, and another man identified only as "Johnny." Carter, who was high on crack, initially was in the basement.

Carter then called everyone in the house into the front room. He ordered Williams to lock the front door and stand there. When everyone was assembled, Carter began asking questions about who was robbing him and refused to let anyone leave. He accused Revels of manipulating everyone to rob him. He then ran to the bedroom and came back with a 12-gauge shotgun. Carter continued

to direct his accusations at Revels and pointed the shotgun at Revels' head. He pulled the trigger, but the shotgun did not fire.

Carter then loaded the shotgun and sat down on a couch. He then focused his accusations on Gardenhire, pressuring Gardenhire to admit he had robbed him or was planning to do so. Carter put the shotgun to Gardenhire's forehead, giving him "ten seconds." After 5 seconds, he put the shotgun to Gardenhire's eye. Gardenhire protested that he would never rob Carter and suggested that Carter just pull the trigger. Carter looked at Revels and said Gardenhire sounded "real convincing." Then Carter turned and shot Revels.

After the shot was fired, Gardenhire, Harris, and Armstrong ran out the back door and jumped into their cars. Gardenhire called 911 but did not give his real name for fear his involvement would be a violation of his parole. Gardenhire later made a statement to the police implicating Carter. Christiansen also called 911; he, Harris, and Armstrong were initially reluctant to provide information but eventually pointed police toward Carter. Police later arrested Carter near his ex-wife's apartment in Topeka and charged him with first-degree murder of Revels, aggravated assault of Gardenhire, and criminal possession of a firearm.

Carter went through four attorneys: his first appointed counsel, Mark J. Dinkel, withdrew based on a conflict of interest; Dinkel had previously represented Gardenhire and suggested he might need to use information gained in that representation to represent Carter effectively. Carter's next appointed counsel, Joseph A. Allen, had previously represented Bledsoe, another eyewitness who was endorsed by the State. Attorney Ronald Hodgson was appointed next; he also filed a motion to withdraw based on a conflict of interest with another client of the public defender's office. When the district court permitted Hodgson to withdraw, the court appointed Jack Sheahon to defend Carter.

At Carter's jury trial, Gardenhire, Christiansen, Harris, and Armstrong described the events leading to Revels' death essentially as set out above. Each testified that Revels was unarmed and that he had not provoked or attacked Carter. Williams testified he was not at the murder scene and knew no one involved.

Judith Wesley, Carter's ex-wife, testified that Carter had admitted killing Revels; he told her Revels and Gardenhire threatened to rob him and kill him, so he shot first. Regarding Gardenhire, she reported that Carter said "he was going to shoot [him], but he forgot or something." Carter did not mention to Wesley whether Revels was armed.

Among the State's other evidence was a photograph of Revels' body lying in the living room where he was killed. The photograph also depicts Revels' intestines partially outside of his abdomen. The defense had objected to admission of such photographs earlier in the proceedings.

Toward the end of the State's case, Carter told the district judge that he was unsatisfied with his lawyer's performance and that he did not want to continue with him as counsel. Defense counsel Sheahon told the judge that he "didn't feel he was providing inadequate counsel." After learning more from Carter about the nature of his complaints, the district judge ruled that he would not allow Carter to obtain new counsel in the middle of the jury trial.

One of the reasons Carter expressed dissatisfaction was related to Bledsoe. Specifically, Carter wanted Bledsoe to testify about the content of a telephone conversation he had had with Carter while Carter was in jail awaiting trial. During that conversation, Bledsoe stated that he knew there had been a plan to rob Carter. Defense counsel had subpoenaed Bledsoe, as had the State. Although served personally three times, Bledsoe absconded. The State then issued a pick-up order, but Bledsoe had not been found in time for trial. In place of his testimony, the audiotape of the telephone conversation between Carter and Bledsoe was admitted into evidence. The State also offered to let the defense question the investigator who had interviewed Bledsoe pretrial and pledged not to object to admission of Bledsoe's hearsay statements.

Carter testified in his own defense. He said that he shot Revels because he believed he was going to be robbed; that Gardenhire, Revels, Armstrong, and others had been in the basement with him and were armed with a Taser, a gun, and a hammer; and that they had assaulted him and threatened to hang him with electrical wires. Carter testified he was scared for his life and "thought he was

dead." Then everyone went upstairs, and Revels, who had a gun, told Carter that he was going to kill him. It was only then that Carter's shotgun "went off." Carter walked out of the front of the house, and everyone else ran out of the back.

Other defense witnesses supported Carter's self-defense theory. Reola Lane testified that she had been talking to Carter in the basement on the night of the crime while the others were upstairs. He told her he thought somebody was trying to set him up. She left the house before Revels was shot. An officer testified about a monitored jail telephone call in which Carter told another inmate that Revels, Gardenhire, and Armstrong had taken Carter down to the basement, hung him up, and were electrocuting him, but that they later acted as though Carter was out of his mind. Briana Jacobson, Carter's girlfriend, testified that she talked with Carter while he was in jail awaiting trial and that he told her he had killed Revels in self-defense. John Melvin Lavigne testified that he knew Carter, that he had bought drugs from him, and that he had heard there was a plan to rob him.

The State called several rebuttal witnesses whom Carter had named in his testimony as among those plotting to rob him. Each testified that there was no such plot.

The pattern instructions submitted and read aloud to Carter's jury contained an *Allen*-type instruction.

### Right to a Complete Defense

Carter argues that the district judge's refusal to grant a continuance to locate Bledsoe was an abuse of discretion and violated his constitutional right to present a defense.

K.S.A. 22-3401 provides a district court may grant a continuance "for good cause shown," and its refusal to grant a continuance will not be disturbed on appeal absent a showing of an abuse of discretion. Moreover, Carter has the burden to prove that his rights were substantially prejudiced by the decision of the district court. *State v. Lackey*, 280 Kan. 190, 216, 120 P.3d 332 (2005), *cert. denied* 547 U.S. 1056 (2006), *overruled on other grounds State v. Davis*, 282 Kan. 666, 148 P.3d 510 (2007). When a criminal defendant claims that a district judge has interfered with his or her

constitutional right to present a defense, we review the issue de novo. *State v. Kleypas*, 272 Kan. 894, 921-22, 40 P.3d 139 (2001), *cert. denied* 537 U.S. 834 (2002).

When a continuance is requested during trial, the district judge should weigh the possible prejudice to the parties, the diligence or lack thereof in attempting to secure a witness, the materiality and importance of the probable testimony, and the probability of the witness' appearance at a later date if a continuance is granted. *Lackey*, 280 Kan. at 218; *State v. Howard*, 221 Kan. 51, 55, 557 P.2d 1280 (1976).

Carter suggests that the district court failed to weigh these three factors. We acknowledge that the record shows no explicit discussion of them at the time the district court denied the continuance. Nevertheless, we conclude there was no abuse of discretion and no constitutional error.

Considering the first two factors, under the circumstances before us, we see no possibility of prejudice to Carter from the omission of Bledsoe's repetitive testimony. To the extent Bledsoe's evidence would have been helpful to the defense, other witnesses were present to testify that they were aware someone was planning to rob Carter, and they did so testify. In addition, Bledsoe's statement on this topic was admitted through the audiotape of the telephone conversation and the testimony of an officer who overheard it. We also must not forget that Carter had at least as much to lose as he had to gain from Bledsoe's appearance at trial; the State sought his testimony for a reason: Bledsoe would have been another in an already impressively long lineup of eyewitnesses willing to swear that Carter shot an unarmed Revels.

As to the diligence with which Bledsoe's appearance was sought, both the State and the defense did their utmost to ensure Bledsoe would be in court. In addition to service of multiple subpoenas, a pick-up order was issued. Bledsoe was traced from Kansas to Colorado and then to Texas. There was no way at the time of the motion for continuance to estimate how much longer it would take to find Bledsoe or even if that could ever be accomplished. Bledsoe had told the State long in advance of trial that he had no intention

of showing up to testify. He appeared quite capable of making good on that statement.

Our conclusion that there was neither an abuse of discretion nor a constitutional violation is consistent with the precedent of this court.

For example, in *Lackey*, 280 Kan. at 218, we agreed with the district court that an indefinite continuance the day of trial was not justified when the missing witness would have testified that the victim's boyfriend acted inappropriately at her funeral and that the witness had spoken with the victim 2 days after her supposed murder. The first proffered evidence was not relevant to establish that the boyfriend, rather than defendant, killed the victim, and the second, while material to contest time of death, was unreliable because the witness was not firm on the dates and phone records did not confirm the call. The witness did not want to be found, two of the State's witnesses had already died in this 20-year-old murder case, and the defendant's several-month search for the witness had been unsuccessful. See also *Howard*, 221 Kan. at 54-55 (despite two subpoenas for defendant's alibi witness and message left with family, typographical error prevented sheriff from locating witness; district court granted half-day continuance but denied 2-week continuance; no proffer of what witness would testify to or demonstration that witness could reasonably be expected to appear if longer continuance granted; no abuse of discretion); compare *State v. Jones*, 226 Kan. 503, 509-10, 601 P.2d 1135 (1979) (identity of defendant principal issue; eyewitness with exculpatory evidence failed to appear at trial despite defendant's substantial efforts; denial of request for bench warrant, continuance until next morning abuse of discretion, prejudicial error); *Winkelman v. Allen*, 214 Kan. 22, 34, 519 P.2d 1377 (1974) (district court's refusal to grant a 1-day continuance when weather conditions prevented expert witness' presence; expert's testimony regarding standards of the real estate industry concerning a "qualified buyer" crucial; denial of continuance prejudicial, reversible).

*Withdrawal of Defense Counsel*

In this claim, Carter contends the district judge failed to inquire about his midtrial dissatisfaction with defense counsel.

It is the task of the district court judge to insure that a defendant's right to counsel under the Sixth Amendment to the United States Constitution is honored. *State v. Taylor*, 266 Kan. 967, 975, 975 P.2d 1196 (1999); see *State v. Cromwell*, 253 Kan. 495, 499-504, 856 P.2d 1299 (1993), *modified on other grounds State v. Willis*, 254 Kan. 119, 864 P.2d 1198 (1993). Irreconcilable conflict between a defendant and his or her attorney may, in certain circumstances, require the appointment of substitute counsel to protect the defendant's Sixth Amendment right to effective assistance of counsel.

The United States Supreme Court has suggested that a trial judge who becomes aware of a possible conflict of interest between an attorney and client must inquire, and the failure to do so can require reversal. *Wood v. Georgia*, 450 U.S. 261, 272 n.18, 67 L. Ed. 2d 220, 101 S. Ct. 1097 (1981) (citing *Cuyler v. Sullivan*, 446 U.S. 335, 347, 64 L. Ed. 2d 333, 100 S. Ct. 1708 (1980). We have adopted *Wood's* holding. *Taylor*, 266 Kan. at 979; see *State v. Jenkins*, 257 Kan. 1074, 1084, 898 P.2d 1121 (1995) ("where the trial court is advised of the possibility of a conflict by either the defendant or the State, the court is required to initiate an inquiry to insure that the defendant's Sixth Amendment right to counsel is not violated").

When the trial court fails to inquire into a potential conflict, the defendant is entitled to reversal if he or she can establish that the conflict significantly affected his or her counsel's performance, thereby rendering the verdict unreliable. *Mickens v. Taylor*, 535 U.S. 162, 172-73, 152 L. Ed. 2d 291, 122 S. Ct. 1237, *reh. denied* 535 U.S. 1074 (2002); *State v. Gleason*, 277 Kan. 624, 653-54, 88 P.3d 218 (2004). However, if an appropriate inquiry is made, we review a district judge's refusal to permit withdrawal of defense counsel only for abuse discretion. See *Taylor*, 266 Kan. at 978. This is the type of claim we must consider here.

After a recess near the end of the State's case, Carter said he wanted to speak to the district judge in chambers. The following exchange then occurred:

"THE COURT: All right, Mr. Carter. The jury's . . . in the jury room. They're not here to hear anything. What do you want to say? Have you told counsel what it is you want to tell me, or what —

"MR. CARTER: Yes, sir. I would like to mention a few things. That's why I'd rather be, you know, in your chambers.

"THE COURT: What's the purpose of this conversation, Mr. Carter? What do you want me to do?"

Carter said that he thought a particular telephone call had come at 7:07 rather than 8:07, as a State witness had just testified. Carter apparently was disappointed that his counsel had not objected or introduced conflicting testimony on that point. Carter also indicated he was upset because he believed his counsel had not subpoenaed Bledsoe.

The district judge responded that he expected defense counsel to bring up the issues "in due course." He also reminded Carter that he did not have the experience that his counsel had in trying serious cases.

Carter then said:

"I've been talking to him, but, see, I'm not getting no reply. I don't feel like I'm getting adequate counseling right now. He's up there asking questions. When I go to talk to him, he ain't talking back to me. So, right now, I would like — sir, I don't feel like I'm getting adequate counseling . . . .

. . . .

"Now, I'm not going no further in this court with, with this man, and him and [the prosecutor] over here siding up. I'm not going with that. I've been sitting here listening to it the whole time. I'm just not going to do it. I would rather give me some more counseling, shut this down, because it's not right."

The judge then gave defense counsel Sheahon a chance to speak, and the following exchange occurred:

"MR. SHEAHON: Your Honor, if Mr. Carter's unsatisfied with me, I would ask that the Court allow me to withdraw from this case. I don't feel that I'm giving inadequate counsel.

. . . .

"THE COURT: I don't know what some problems are. There are some specific problems that Mr. Carter's upset —

. . . .

"THE COURT: I'm going to give you a chance to listen to him, but let me say this. I'm not going to allow withdrawal of counsel at this time. We're right in the

middle of a trial, and we have a jury trial, and they've listened to the evidence. You have yet to present your evidence. . . .

"Mr. Sheahon, you've been cross-examining. I assume that you've been talking with Mr. Carter about the various witnesses who have appeared. Now, do we need to give you more time before you cross-examine this witness? Is there something I can do to help?"

Sheahon eventually also said that he had, in fact, subpoenaed Bledsoe. The State ultimately offered to stipulate that the telephone call about which Carter was unhappy came at 7:07 rather than 8:07. Also, as discussed above, the audiotape of the Bledsoe telephone conversation came into evidence, and the State offered to admit testimony of the Bledsoe hearsay through the monitoring officer without objection.

The judge spoke again to Carter, saying, "[I]nstead of fussing, I suggest you and Mr. Sheahon talk about this and see if you want to avail yourself of this offer, because what we're doing here is counterproductive. There is no way at this point, after watching everything, the Court's going to stop the trial." The district judge also noted that Carter was arguing about evidence that had not yet been presented and told Carter:

"[I]f I thought Mr. Sheahon was falling below the level that he should, I would have jumped in a long time ago. Now, you let your attorney work. I expect Mr. Sheahon to talk to you and to confer with you. . . . And I think he's doing that. But, if he isn't, he better."

The judge also asked Carter to give Sheahon a chance to cross-examine before being criticized about his handling of the time on the tape.

There were no further suggestions by Carter that he was displeased with his counsel's performance.

On these facts, we rule that the district judge made an adequate inquiry into Carter's problems with his lawyer. The judge took more than 20 minutes outside the presence of the jury to address the issues raised by Carter. He inquired concerning the nature of the conflict and determined that there was no need to stop the trial. Carter was upset about the accuracy of a particular fact introduced into evidence by the State, which his counsel had not yet had an opportunity to contest. He also was upset because of a

misunderstanding about the lengths to which counsel had gone to secure the attendance of Bledsoe. We see no abuse of discretion in the district judge's decision that neither of these issues warranted withdrawal of defense counsel midtrial. Neither constituted an irreconcilable conflict with potential to prejudice the defense.

### Imperfect Self-Defense

Carter's next claim on appeal is that jury instructions improperly stated the law on the interplay between premeditation and imperfect self-defense. In his view, the jury should have been told to deliberate simultaneously on the existence of premeditation and the possibility that Carter entertained an honest but unreasonable belief in the necessity of deadly force against Revels. He concedes that there was no defense objection at trial to the instructions as given.

Under K.S.A. 2006 Supp. 22-3414(3), no party may assign as error the giving or failure to give an instruction, including a lesser included crime instruction, unless the party objects, distinctly stating the matter objected to and the grounds for the objection before the jury retires, unless the instruction is clearly erroneous. "Instructions are clearly erroneous only if the reviewing court is firmly convinced there is a real possibility that the jury would have rendered a different verdict if the error had not occurred." *State v. Bell,* 280 Kan. 358, 365, 121 P.3d 972 (2005).

The district court gave instructions to the jury on first-degree premeditated murder and the lesser included offenses of second-degree intentional murder and voluntary manslaughter consistent with PIK Crim. 3d 68.09.

Instruction No. 2 told the jury to first consider first-degree murder. If it found guilt, it was to sign the applicable verdict form. If not, it was to consider second-degree intentional murder; at the same time it deliberated on second-degree murder, it was to consider voluntary manslaughter. If it agreed defendant was not guilty of second-degree murder or voluntary manslaughter, it should find defendant not guilty.

Instruction No. 3 defined first-degree premeditated murder consistent with PIK Crim. 3d 56.01 and defined premeditation

consistent with PIK Crim. 3d 56.04(b). Instruction No. 4 defined second-degree murder consistent with PIK Crim. 3d 56.03. Instruction No. 5 directed the jurors: "In determining whether the defendant is guilty of murder in the second degree, you should also consider the lesser offense of voluntary manslaughter," and it defined that crime as an intentional killing "done upon an unreasonable but honest belief that circumstances existed that justified deadly force in defense of his person." This instruction was consistent with PIK Crim. 3d 56.05(B). The district judge also gave a voluntary intoxication instruction as a defense to first-degree premeditated murder and the lesser included offenses. The jury also was informed, consistent with PIK Crim. 3d 68.09, that its reasonable doubt as to which of two or more offenses the defendant committed meant he could be convicted only of the lesser offense. Instruction No. 13 set out the parameters of self-defense consistent with PIK Crim. 3d 54.17.

We have previously approved the PIK method of ordering the jury's deliberation on lesser included offenses, stating: " 'The pattern instructions offer an orderly method of considering possible verdicts. The pattern instructions offer a transitional statement that can be inserted at the beginning of the elements instructions of lesser offenses.' " *State v. Lawrence*, 281 Kan. 1081, 1091, 135 P.3d 1211 (2006) (quoting *State v. Roberson*, 272 Kan. 1143, 1153-55, 38 P.3d 715 [2002], *disapproved on other grounds State v. Gunby*, 282 Kan. 39, 144 P.3d 647 [2006]).

Carter argues that these instructions were nonetheless clearly erroneous because he may have premeditated his action in the sense that he thought it over beforehand but, in doing so, arrived at the honest but unreasonable belief that deadly force was necessary. He specifically challenges our recent decisions to the contrary in *Lawrence*, 281 Kan. at 1092-93; *Bell*, 280 Kan. at 367.

In *Lawrence*, the defendant argued that both perfect and imperfect self-defense should be considered simultaneously with first-degree premeditated murder because each concept involved an underlying thought process. In other words, imperfect self-defense would not require the absence of reason, only the absence of *sound* reason. We rejected that argument, holding that the hon-

est but unreasonable belief of imperfect self-defense and the premeditation of first-degree murder are mutually exclusive concepts. 281 Kan. at 1092-93.

We decline Carter's invitation to change our position and reiterate that the imperfect self-defense relating to voluntary manslaughter is not appropriately considered simultaneously with premeditated first-degree murder. If a jury does not agree that premeditated first-degree murder has been proved by the State beyond a reasonable doubt, then it may, under appropriate facts, consider simultaneously the next two lesser degrees of homicide, intentional second-degree murder and voluntary manslaughter, *i.e.*, the killing of a human being committed "upon an unreasonable but honest belief that circumstances existed that justified deadly force . . . ." K.S.A. 21-3403(b). This imperfect self-defense of voluntary manslaughter is not a true defense; it does not absolve a defendant of criminal liability. It is, rather, a lesser degree of the crime of homicide. See K.S.A. 21-3401(a); K.S.A. 21-3402(a); K.S.A. 21-3403(b); *State v. Ordway*, 261 Kan. 776, 786-88, 934 P.2d 94 (1997).

Given all of the above, there was no clear error in the offense and deliberation instructions given at Carter's trial.

### *Prosecutorial Misconduct*

This court's decision in *State v. Tosh*, 278 Kan. 83, Syl. ¶¶ 1, 2, 91 P.3d 1204 (2004), sets forth the governing two-step analysis for allegations of prosecutorial misconduct. It applies regardless of whether the alleged misconduct occurs during witness examination or during closing argument, and it applies regardless of whether there was a contemporaneous objection to the prosecutor's behavior. *State v. Swinney*, 280 Kan. 768, 779, 127 P.3d 261 (2006); see *State v. Dixon*, 279 Kan. 563, 590-92, 112 P.3d 883 (2005); *State v. Overton*, 279 Kan. 547, 558-60, 112 P.3d 244 (2005); *Tosh*, 278 Kan. at 87-89 (cross-examination), 89-93 (closing argument).

The first step asks whether the complained-of conduct was outside the considerable latitude given a prosecutor in discussing the evidence. The second step asks whether the remarks constituted plain error, that is, whether the statements prejudiced the defend-

ant and denied him or her a fair trial. *Dixon,* 279 Kan. at 590-91; see *Overton,* 279 Kan. at 558-59.

The second step requires three factors to be considered: (1) whether the misconduct is gross and flagrant; (2) whether the misconduct shows ill will on the prosecutor's part; and (3) whether the evidence is so direct and overwhelming that the misconduct would likely have had little weight in the minds of jurors. None of these three factors is individually controlling. Moreover, the third factor may not override the first two factors, unless the harmless error tests of both K.S.A. 60-261 and *Chapman v. California,* 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967), have been met. *Swinney,* 280 Kan. at 779-80 (citing *Dixon,* 279 Kan. at 592; *Tosh,* 278 Kan. 83, Syl. ¶ 2).

Carter argues that the prosecutor committed reversible misconduct by misstating the law during her closing argument, when she said:

> "If you find that there is insufficient evidence of premeditation in this case and you do not all twelve agree *to convict* of first-degree murder, then you move to the crime of second-degree murder. . . . Only if all twelve of you *do not agree* it's first degree and do not agree unanimously that it's second degree, then you can move to voluntary manslaughter." (Emphasis added.)

The first portion of the challenged statement is a correct statement of law. *Cf. State v. Hurt,* 278 Kan. 676, 683, 101 P.3d 1249 (2004). The second is not. The jury was not required to rule out second-degree murder before it considered voluntary manslaughter. It was required to consider these two offenses contemporaneously. See 278 Kan. at 683-84; *State v. Graham,* 275 Kan. 831, 837, 69 P.3d 563 (2003); PIK Crim. 3d 56.05(B). The prosecutor, commendably, admitted to her error at oral argument before this court.

We turn to *Tosh*'s second prong to determine whether the second statement prejudiced the defendant and denied him a fair trial. See *Dixon,* 279 Kan. at 590-91. This was an isolated statement; we see no evidence that it was gross or flagrant, and it does not, standing alone, demonstrate ill will. Carter suggests that it would have nevertheless confused his jury because it was made after the instructions had been read and went uncorrected by the judge. We

are not persuaded. The prosecutor correctly stated the law earlier in her closing, and again later in her closing, as did defense counsel in his closing. The instructions, given orally and sent to the jury room in writing, correctly informed the jury that second-degree murder and voluntary manslaughter must be considered simultaneously. See PIK Crim. 3d 56.05(B). Further, the jury was admonished to read and reread the instructions. Finally, we presume the jury followed its instructions, see *State v. Gaither*, 283 Kan. 671, 687, 156 P.3d 602, 613 (2007); *State v. Gonzalez*, 282 Kan. 73, 99, 145 P.3d 18 (2006), meaning it arrived at a verdict of guilty on premeditated first-degree murder before it moved on to the consideration of lesser included offenses.

Regarding the weight of the evidence, it was nearly overwhelming if not certainly so. The State was able to parade several eyewitnesses before the members of the jury, whose credibility was for their determination alone. These witnesses and others contested Carter's assertion that his action was taken against an armed Revels; they disputed his contention that he was trying to foil a robbery plot.

Under all of these circumstances, we conclude the prosecutor's single error was harmless under both K.S.A. 60-261 and *Chapman*, 386 U.S. 18.

### Gruesome Photograph

The district court sustained defense objections to all but one photograph, Exhibit 23, which the court admitted for the purpose of "showing the position of the body and, to some extent, the wound." Carter preserved this issue for appeal.

Our first topic on review is relevance. Generally, all relevant evidence is admissible. Evidence is relevant if it renders a desired inference more probable than it would be without the evidence, or if it has any tendency in reason to prove any material fact. K.S.A. 60-401(b); *State v. Sexton*, 256 Kan. 344, 349, 886 P.2d 811 (1994).

" ' "The admission of photographs in a homicide case is a matter within the trial court's discretion, and the trial court's ruling will not be disturbed on appeal absent the showing of an abuse of that discretion." [Citation omitted.]' " *State v. Adams*, 280 Kan. 494,

510, 124 P.3d 19 (2005) (quoting *State v. Green,* 274 Kan. 145, 147, 48 P.3d 1276 [2002]). Such discretion has been abused " ' "when the admitted photographs were unduly repetitious and cumulative or their introduction was solely for the purpose of prejudice." ' " *Adams,* 280 Kan. at 510 (quoting *Green,* 274 Kan. at 147).

We have stated that " ' "[p]hotographs depicting the extent, nature, and number of wounds inflicted are generally relevant in a murder case." ' " *Adams,* 280 Kan. at 510 (quoting *Green,* 274 Kan. at 147). Photographs that are relevant and material to assist the jury's understanding of medical testimony are admissible. Specifically, photographs that aid a pathologist in explaining the cause of death are admissible. Photographs used to prove the manner of death and the violent nature of the crime are relevant and admissible. *Adams,* 280 Kan. at 510. Here, Carter insists that this particular photograph—depicting Revels' body lying in the living room where he was killed, his intestines partially outside of his abdomen—was irrelevant to any material fact in issue because the cause and means of death were not contested at trial.

We recognize the cause and means of death were not at issue in this case; still, the photograph was relevant. It gave the jury an understanding of the size of the living space in which the events transpired, and it gave context to the diagrams in which eyewitnesses had placed the multiple people present. It showed the position of the victim, curled in near-fetal position, face downward between the couch and a coffee table, gripping his midsection. There is, to a limited degree, an indication of the nature and extent of the injury caused to the victim's body by the close-range shotgun blast.

Next, we consider whether the photograph was unduly repetitious or cumulative. It was not. No other crime scene photos of the victim were admitted into evidence or shown to the jury.

Finally, the gruesome nature of this photograph was not so extreme that it compels the conclusion it was admitted solely to cause undue prejudice to Carter. In contrast to photographs of most victims whose lives end violently, it shows very little blood. In fact, the photograph was helpful to Carter in one respect—the defense

sought to persuade the jury that the absence of blood at the crime scene tended to support the existence of reasonable doubt.

"Gruesome crimes result in gruesome photographs." *Green,* 274 Kan. at 148. This photograph is unpleasant but far less gruesome than the norm. See *State v. James,* 279 Kan. 354, 357-58, 109 P.3d 1171 (2005). The district judge did not abuse his discretion in admitting it.

### Allen-type Instruction

Carter also claims the district judge erred in giving an *Allen*-type instruction before deliberations began that "[l]ike all cases, [this case] must be decided sometime." See *Allen v. United States,* 164 U.S. 492, 501-02, 41 L. Ed. 528, 17 S. Ct. 154 (1896). He contends this instruction misled members of the jury by telling them they had to make a decision. Carter admits there was no objection to this instruction at trial.

Our standard of review, as set out previously, is whether the instruction was clearly erroneous, that is, whether we are firmly convinced there is a real possibility the jury would have rendered a different verdict if the error had not occurred. *Bell,* 280 Kan. at 364; see K.S.A. 2006 Supp. 22-3414(3).

A prior version of PIK Crim. 3d 68.12 contains the wording challenged in this case; the current pattern instruction, amended in 2005, omits the offending language and we encourage trial courts to discontinue using the pre-2005 version. See *State v. Scott-Herring,* 284 Kan. 172, 181, 159 P.3d 1028 (2007). The use of PIK instructions, while not mandatory, is strongly recommended. The pattern instructions have been developed by a knowledgeable committee to bring accuracy, clarity, and uniformity to jury instructions. See *State v. Hebert,* 277 Kan. 61, 87, 82 P.3d 470 (2004).

We have acknowledged that the outdated *Allen*-type instruction "has been the source of some controversy." *State v. Anthony,* 282 Kan. 201, 216, 145 P.3d 1 (2006). We have disapproved of its use when given after deliberations have begun. See, *e.g., State v. Struzik,* 269 Kan. 95, Syl. ¶ 6, 5 P.3d 502 (2000); *State v. Boyd,* 206 Kan. 597, 600-01, 481 P.2d 1015 (1971), *cert. denied* 405 U.S. 927 (1972); *Bush v. State,* 203 Kan. 494, 498-99, 454 P.2d 429 (1969).

However, even in those situations, the giving of such an instruction has rarely resulted in a reversal. See, *e.g.*, *State v. Troy*, 215 Kan. 369, 373, 524 P.2d 1121 (1974).

When, as here, the instruction accompanies all of the rest of the instructions given before deliberations begin, this court has concluded there is no error. See *Anthony*, 282 Kan. at 216; *State v. Makthepharak*, 276 Kan. 563, 569, 78 P.3d 412 (2003); *State v. Roadenbaugh*, 234 Kan. 474, 483, 673 P.2d 1166 (1983); *State v. Irving*, 231 Kan. 258, 265-66, 644 P.2d 389 (1982). We will not depart from those holdings in this case. Even if it is not literally inevitable that "all cases . . . must be decided sometime," inclusion of the quoted language in this instruction, given before deliberations, does not render it clearly erroneous. *Anthony*, 282 Kan. at 216-17. There is no real possibility that the jury would have returned a different verdict had this instruction not been given.

### Order of Deliberations

Defendant argues that jurors received an erroneous "acquit-first" or "hard-transition" instruction that forced them to reach a unanimous decision *not* to convict on premeditated first-degree murder before moving on to consideration of any lesser included offense.

In fact, the wording of both Instruction No. 2 and Instruction No. 4 took a "soft-transition" approach. Instruction No. 2 said: "[I]f you do not find the defendant guilty of murder in the first degree, you should then consider the lesser offense of murder in the second degree as defined in Instruction No. 4." (Emphasis added.) Instruction No. 4 said: *"If you do not agree* that the defendant is guilty of murder in the first degree, you should then consider the lesser included offense of murder in the second degree." (Emphasis added.) We have previously approved of ordering jury deliberations in this manner; these alternative wordings are not coercive and correctly state the law. See *Scott-Herring*, 284 Kan. at 178-79; *State v. Gunby*, 282 Kan. 39, 65-66, 144 P.3d 647 (2006); *State v. Hurt*, 278 Kan. 676, 682-86, 101 P.3d 1249 (2004); *State v. Davis*, 275 Kan. 107, 126-27, 61 P.3d 701 (2003); *State v. Roberson*, 272 Kan. 1143, 1154-55, 38 P.3d 715 (2002), *overruled on other*

*grounds State v. Gunby*, 282 Kan. 39; *State v. Korbel*, 231 Kan. 657, 661, 647 P.2d 1301 (1982). There was no error on this issue.

### Cumulative Error

Carter's last issue on this appeal is cumulative error. Cumulative trial errors, considered collectively, may be so great as to require reversal of a defendant's conviction. The test is whether the totality of the circumstances substantially prejudiced the defendant and denied him or her a fair trial. No prejudicial error may be found under the cumulative effect rule if the evidence is overwhelming against a defendant. *Anthony*, 282 Kan. at 216.

Here, we hold that there was only one error, the prosecutor's misstatement of the law regarding simultaneous deliberation of intentional second-degree murder and voluntary manslaughter. One error cannot support reversal under the cumulative error doctrine. 282 Kan. at 217.

Affirmed.