No. 87,217

STATE OF KANSAS, *Appellee*, v. JAMES L. GRAHAM, *Appellant.*

69 P.3d 563

Review of the judgment of the Court of Appeals in an unpublished decision filed November 1, 2002. Opinion filed May 30, 2003.

*Rick Kittel,* assistant appellate defender, argued the cause, and *Steven R. Zinn,* deputy appellate defender, was with him on the brief for appellant.

*James L. Spies,* assistant district attorney, argued the cause, and *Arthur Rhodes,* assistant district attorney, *Nick A. Tomasic,* district attorney, and *Carla J. Stovall,* attorney general, were on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: James L. Graham's conviction of attempted second-degree murder was affirmed by the Court of Appeals in *State v. Graham*, No. 87,217, unpublished opinion filed November 1, 2002. We granted his petition for review based primarily upon his claim that the jury instruction on voluntary manslaughter was clearly erroneous requiring a new trial. A divided Court of Appeals rejected his claim, concluding that there was no real possibility the jury would have rendered a different verdict had the jury been properly instructed. We disagree, reverse, and remand for a new trial.

Before discussing the facts, it is important to note that there is no dispute the trial court gave the wrong instruction on voluntary manslaughter. Graham was charged with attempted first-degree murder and the jury was instructed on the lesser included offense of voluntary manslaughter. The Pattern Instructions for Kansas (PIK) Crim. 3d 56.05 "Notes on Use," advises that when voluntary manslaughter is submitted to the jury as a lesser offense of the crime charged, the following Alternative B should be used:

"B. In determining whether the defendant is guilty of murder in the second degree, you should also consider the lesser offense of voluntary manslaughter. Voluntary manslaughter is an intentional killing done (upon a sudden quarrel) (in the heat of passion) (upon an unreasonable but honest belief that circumstances existed that justified deadly force in defense of [a person] [a dwelling] [property]).

"If you decide the defendant intentionally killed ____, but that it was done (upon a sudden quarrel) (in the heat of passion) (upon an unreasonable but honest belief that circumstances existed that justified deadly force in defense of [a person] [a dwelling] [property]), the defendant may be convicted of voluntary manslaughter only."

Instead, the trial court gave a voluntary manslaughter instruction as if Graham had been charged with voluntary manslaughter:

"If you do not find the defendant is guilty of Attempted Second-Degree Murder, you should then consider the lesser included offense of Attempted Voluntary Manslaughter.

"To establish this charge, each of the following claims must be proved:

1. That the defendant performed an act toward the commission of the crime of Voluntary Manslaughter;

2. That the defendant did so with the intent to commit the crime of Voluntary Manslaughter;

3. That the defendant failed to complete commission of the crime of Voluntary Manslaughter; and

4. That this act occurred on or about the 11th day of October, 1999, in Wyandotte County, Kansas.

"The elements of Voluntary Manslaughter are as follows:

1. That the defendant intentionally killed Donald Crow;

2. That it was done upon a sudden quarrel or in the heart of passion; and

3. That this act occurred on or about the 11th day of October, 1999, in Wyandotte County, Kansas.

"As used in these instructions the word 'heat of passion' means any intense or vehement emotional excitement which was spontaneously provoked from circumstances. Such emotional state of mind must be of such degree as would cause an ordinary person to act on impulse without reflection."

Graham did not object to the instruction given by the trial court. K.S.A. 2002 Supp. 22-3414(3) provides:

"No party may assign as error the giving or failure to give an instruction, including a lesser included crime instruction, unless the party objects thereto before the jury retires to consider its verdict stating distinctly the matter to which the party objects and the grounds of the objection unless the instruction or the failure to give an instruction is clearly erroneous. Opportunity shall be given to make the objections out of the hearing of the jury."

See *State v. Crabtree*, 248 Kan. 33, 39, 805 P.2d 1 (1991). An instruction is clearly erroneous only if the reviewing court is firmly convinced that there is a real possibility the jury would have rendered a different verdict had the jury been properly instructed. *State v. Evans*, 270 Kan. 585, 588, 17 P.3d 340 (2001). Thus, the question presented for review is whether this court is firmly convinced that there was a real possibility the jury would have rendered a different verdict had the jury been properly instructed.

Our review is dependent upon the following facts set forth in the Court of Appeals' opinion:

"The events leading up to the charges in this case occurred on October 11, 1999, when Donald Crow, the victim, moved into Leonard Neel's trailer in the Glenbrook Mobile Home Community. Around 10 a.m. after Crow finished moving his belongings into the trailer, he and Neel began drinking beer. Joe Beach and Gordon Johnson joined the pair. Graham's wife, Kathleen, joined the group. The Grahams lived next door to Neel.

"Before Graham joined the party, Kathleen told the group that she had been having difficulties with Graham because a week earlier she had caught him with another woman. After Graham arrived at Neel's trailer, Crow claims that Kathleen started flirting with him. The group eventually ran out of beer, so Crow and Graham volunteered to make a beer run. Crow testified that during this trip he

told Graham that Kathleen had been flirting with him, but that Graham could be assured that he was not interested in Kathleen. Graham denies he and Crow discussed Kathleen.

"Graham and Kathleen eventually went to their trailer. About an hour later Kathleen returned to Neel's trailer without Graham and joined the group in smoking marijuana. She again made it known she was angry with Graham. Later, Graham arrived in a truck and ordered Kathleen to get in. She refused. Graham threatened Kathleen, but Crow intervened and told Graham that he would not allow him to hurt Kathleen. Following an angry exchange between Graham and Crow, Graham drove off. Crow left the party between 6 and 7 p.m. and ate dinner at the Beach trailer, washing it down with 2 or 3 more beers. Crow testified he told Beach that Kathleen was 'coming on to him' and he believed there was going to be a fight. Beach does not recall Crow telling him this.

"Crow returned to the Neel trailer and sat down on the porch. Crow's version is that Graham returned to the trailer and ran from his pickup toward the Neel trailer. As he approached, Crow says Graham cursed him and said he was going to kill him. Crow told Graham he did not have a 'beef' with him. Crow testified that Graham began to climb the steps of the porch and he told Graham not to come up the steps and attempted to position himself so he could kick Graham down the stairs if he proceeded. Crow testified Graham suddenly stabbed him in the middle of the chest. Both Graham and Crow fell off the porch with Crow landing on his back and Graham on top of him. Kathleen left to call the police.

"Graham testified he jumped out of his truck to intervene because he saw Crow had Kathleen by her hair and kissed her. He said by the time he reached the stairs, Kathleen was trying to get away, but Crow still had her by the hair. Graham testified he ran up the stairs and spun Crow around to get him to release Kathleen. But, Graham also testified that Crow let go of Kathleen's hair when he reached the bottom of the stairs, but he did not stop, even though Kathleen was moving away, because it was too late.

"Graham testified Crow cut his hand with a knife. He said they fell off the porch and landed on the ground. While on the ground, Graham noticed Crow was bleeding from the face. He said he tried to get up and Crow stabbed him. According to Graham's testimony, the next thing he knew, he had his own knife in his hand. Graham's knife had a 3.5-inch locking blade that was opened by using a thumbnail to pry the blade open. He admitted he stabbed Crow in the torso and in the arm. He said he continued to stab Crow until Crow stopped struggling. He claims he received a total of 8 knife wounds from Crow but they were not deep because he had blocked Crow's attack.

"Graham testified he retrieved the knife from Crow and left the scene. Graham testified the knife that Crow had was a 8- to 10-inch long kitchen knife from the Graham household. He said he drove around because he was scared and he knew he had hurt someone. He said he threw both knives out of the window as he drove over the Kaw River. He said he did not seek immediate medical treatment for his wounds because he was scared. He went to a friend's house and called

Kathleen in the morning. He left his truck at his friend's house because he was afraid and everyone knew his truck.

"Kathleen testified she saw Graham around 5 or 6 a.m. the next morning. He called her from a bowling alley and asked her to take him to the hospital. On the way, they stopped by Graham's employer to pick up his paycheck. Kathleen saw that Graham had a lacerated thumb and several puncture wounds in the lower part of his stomach. Upon further questioning about the type of wounds she had seen, Kathleen became evasive and complained she was being 'badgered.' The trial court instructed Kathleen to answer the questions, and she eventually acknowledged the wounds were 'cuts,' were not bleeding, and were not very long. She said the amount of blood around the wounds was equivalent to what would result from a cut finger. Kathleen testified that Graham told her Crow had a knife during the altercation and it looked like one of her kitchen knives. She said Graham had bruises on his legs and scratches on his arm.

"Kathleen testified that Graham told the doctor he had injured his hand while working on his truck. He did not tell the doctor he had sustained wounds to his stomach. Kathleen testified that although she is a certified nurse's aide, she did not tell the doctor that she had seen wounds on Graham's stomach, because Graham could speak for himself. Graham testified he did not tell the doctor about his stomach wounds because he was afraid the doctor would call the police.

"After leaving the hospital, Graham and Kathleen checked into a motel. Kathleen testified that she took photographs of Graham's injuries in case they needed to show something to the 'right people.'

"The doctor testified Graham had sustained a 2-centimeter laceration in the web between his thumb and index finder. He also had a bone chip on the thumb near the joint. In the doctor's opinion, the laceration was consistent with a knife wound, but the bone chip was caused by hitting something hard. The doctor testified that Graham told him he had injured his hand while working on his car and the injuries were consistent with that history. Since Graham did not tell the doctor about the other injuries, the doctor only treated the hand.

"The medical evidence was that Crow, in addition to being stabbed in the chest, sustained cuts to his throat, face, and arm. His diaphragm, liver, chest wall, and right lung were punctured. His lung collapsed. His voice box was lacerated, and a tube was inserted so he could breathe. Crow lost half of his blood volume. The toxicology report indicated that Crow had marijuana, cocaine, pain killers, benzodiazepine (a sedative), barbiturates, and PCP in his system.

"Graham moved for a directed verdict and argued the State had not proved premeditation. The motion was denied.

"At the jury instruction conference, the trial court indicated it planned to give instructions on attempted first-degree murder, attempted second-degree murder, attempted voluntary manslaughter, aggravated battery, and self-defense. Graham objected to the inclusion of the attempted second-degree murder instruction. The court ruled under the totality of the evidence, the jury could find Graham intended to kill Crow, but the act was not premeditated. The court observed the jury could

believe the stabbing occurred in the heat of passion and, therefore, the lesser instruction of attempted second-degree murder was required. Graham asked that an instruction on voluntary intoxication be given. The court found the evidence did not warrant giving the instruction. No other objections were made to the court's proposed instructions.

"The jury found Graham guilty of attempted second-degree murder."

## Discussion and Analysis

The majority and dissenting opinions of the Court of Appeals and both parties address *State v. Cribbs*, 29 Kan. App. 2d 919, 34 P.3d 76 (2001), the only other Kansas appellate decision dealing with the precise question we must resolve. In *Cribbs*, the Court of Appeals reversed the defendant's conviction because the district court failed to properly instruct the jury on attempted voluntary manslaughter. 29 Kan. App. 2d at 923-24. *Cribbs* is strikingly similar to this case in the following respects: (1) Both involved a charge of attempted first-degree murder, (2) both involved an erroneous instruction on voluntary manslaughter, (3) in both cases the defendant failed to object to the erroneous voluntary manslaughter instruction, and (4) both cases involved similar substantive facts.

*Cribbs* concluded that the "basic reordering of the jury's decision-making process [by giving an erroneous voluntary manslaughter instruction] merits the 'clearly erroneous' label." 29 Kan. App. 2d at 924. The Court of Appeals explained what it meant by basic reordering of the jury's decision-making process:

"The district court erred by employing [PIK Crim. 3d 56.05] Alternative A [voluntary manslaughter instruction to be given when defendant charged with voluntary manslaughter] rather than Alternative B [voluntary manslaughter instruction to be given when voluntary manslaughter is a lesser included offense]. In essence, Cribbs' jury was told that it need not bother considering attempted voluntary manslaughter unless and until it failed to agree on his guilt of attempted second-degree murder. It [the jury] may never have fully analyzed whether the shooting was the product of heat of passion or a sudden quarrel, the factors that distinguish the greater and the lesser crimes and the reasons they require simultaneous deliberation when the evidence could support either.

". . . The State urges us to focus on the additional instruction telling Cribbs' jury: 'When there is a reasonable doubt as to which of two or more offenses the defendant is guilty, he may be convicted of the lesser offense only.' In our view, however, this instruction was insufficient to cure the error, because it still made any consideration of attempted voluntary manslaughter contingent on the jury's

prior inability to convict on attempted second-degree murder." 29 Kan. App. 2d at 924.

This "reordering" deprived the jury of the opportunity to consider the mitigating circumstances of heat of passion or sudden quarrel which reduce an intentional homicide from murder to voluntary manslaughter. Both second degree-murder and voluntary manslaughter are intentional killings. An intentional homicide is reduced from murder to voluntary manslaughter if it is committed upon a sudden quarrel or in the heat of passion under K.S.A. 21-3403(a). Where the homicide is intentional and there is some evidence the homicide was committed under the mitigating circumstances contained in K.S.A. 21-3403(a), the appropriate voluntary manslaughter instruction should be considered by the jury during its consideration of second-degree intentional murder. Thus, where there is evidence of mitigating circumstances justifying an instruction on voluntary manslaughter in a case where voluntary manslaughter is a lesser included offense, a failure to instruct the jury to consider such circumstances in its determination of whether the defendant is guilty of second-degree murder, is always error—and in most cases—presents a case of clear error.

The majority opinion of the Court of Appeals in this case attempts to distinguish *Cribbs* on its facts. However, the dissenting opinion in this case notes that the facts are sufficiently analogous to *Cribbs* "to merit our likewise labeling the instructing given as 'clearly erroneous' and, thus, reversible error." We agree with the *Graham* dissenting opinion. Because we must determine whether there was a real possibility the jury would have rendered a different verdict if the trial error had not occurred, we compare *Cribbs* to this case.

*Cribbs* arose out of a bloody confrontation just after midnight on New Year's Day 1999 between Cribbs and Angela Jones, a woman with whom he had been living. Jones' three children and one grandchild also lived in the same apartment. As the following facts in *Cribbs* demonstrated clear error, a comparison of those facts in *Cribbs* to the facts in this case also demonstrates clear error in not providing the jury with the appropriate attempted voluntary manslaughter instruction:

"Patrick Hert, who was living one floor up in the same apartment building at the time, testified that Jones knocked on his door after a midnight celebration of the new year. She dropped a bag of clothes on the floor and left. About 10 minutes later, Hert heard sounds of wrestling followed by three gunshots coming from the hall. When he investigated, he saw Jones lying on the second floor landing with blood around her head.

"Jones' son, Dwight, testified that he had seen Cribbs shooting a gun at the New Year's celebration outside their apartment, and he had not seen Jones doing likewise. After Cribbs left and Dwight went inside, Jones received a phone call. Dwight heard Jones say, '[M]other F'er, you're playing me' and telling the person to whom she was speaking that she would throw his clothes out. Dwight testified that *his mother then took Cribbs' clothes upstairs.*

"Dwight also testified that he saw Cribbs shoot his mother. He said Cribbs passed Jones on the stairs and knocked on a door and said, '[M]other F'er, give me my stuff and take it back down there.' When Jones said no, Cribbs pulled a gun out of his pocket, pointed it at her, and said, '[M]other F'er, I'll shoot you.' Jones replied, 'No, you won't,' and Cribbs shot her, causing her to fall over the rail and to the ground. Dwight also testified that there were three shots. Cribbs then dropped the gun, walked halfway to the door, went back to grab the gun, and ran out of the building. Dwight ran back into the apartment and called his uncle and told him that Cribbs had shot his mother. His uncle verified the fact of this phone conversation during his testimony at trial.

"Cribbs took the stand in his own defense. He testified he spent most of New Year's Eve drinking and 'doing' marijuana and cocaine. He returned to the apartment he shared with Jones and the children about 11 p.m., and he, Jones, Dwight, and one of the other children went outside to shoot a gun with other people doing the same. He said that, when he returned to the apartment about 1 a.m., he saw the gun on a dresser and told Jones she needed to put it away. He then left again to talk with one of the children. When he returned, he ran into Willie Brownlee. Brownlee told him Jones was cussing about him leaving and had a gun in her pocket.

"Cribbs said he then saw Jones standing at the top of the stairs with a gun in her hand. He rushed her to get the gun out of her hand, and both of them slammed against the walls in the process. He then tried to throw her down the stairs to break her grip on the gun and kept himself from falling with her by using his foot. When he finally was able to grab the gun from her, it went off. Jones then fell down the stairs. Cribbs ran out of the building and drove away when he saw Jones lying in a puddle of blood.

"Police found four apparently fresh bullet holes at the scene. Detectives Randall Eskina and Richard Nepote and Officer Christopher McAlister all testified that three of the holes were consistent with a gun being fired by someone lower on the stairs shooting upward." 29 Kan. App. 2d at 920-21.

In this case, there was a confrontation between Graham and his wife Kathleen which developed during the day and was exacer-

bated by Graham's perception that Crow was interfering with Graham's relationship with Kathleen. According to Graham, he attacked Crow after observing that Crow had Kathleen by her hair and had kissed her.

The State argues, that unlike this case, there were several critical facts present in *Cribbs* that significantly increased the likelihood that a jury would return a verdict of attempted voluntary manslaughter for shooting the victim upon a sudden quarrel or in the heat of passion. Immediately proceeding the shooting, an argument erupted between the parties giving rise to an emotionally-charged domestic situation. However, in the present case, the quarrel between Crow and Graham had continued throughout the day. According to the State, the evidence in this case disclosed "a brutal, intentional stabbing, committed by a jealous husband who had watched his wife flirt with the victim all afternoon." Thus, argues the State, the evidence supported either attempted first-or second-degree murder, not voluntary manslaughter.

The State also argues that the jury's questions posed to the trial court during jury deliberations demonstrated that the jury was struggling between convicting Graham of attempted first-degree murder and attempted second-degree murder. During jury deliberations, the jury asked the following question with respect to the second-degree murder instruction: "Did the intent to kill have to be prior to the act of happening or can his intent to commit murder begin when he is on top of Don Crow still stabbing him and does not get off Don Crow?" The jury then asked the following: "Could premeditation be the short time from truck to porch?" According to the State, the questions demonstrated that the jury's thought process was not linear, that the jury had considered all the elements of all the crimes together, and that it would have, had it been convinced by the evidence, convicted Graham of attempted voluntary manslaughter.

In response to the above arguments, we note that in both *Cribbs* and this case there was some evidence of "heat of passion" or "sudden quarrel." Thus, in each case the defendant was entitled to have the jury consider such evidence during its consideration of the elements of attempted second-degree murder.

While the trial court instructed the jury of all the alternative crimes, including attempted second-degree murder and attempted voluntary manslaughter, the jury was also advised that "when there is a reasonable doubt as to which of two or more offenses the defendant is guilty, he may be convicted of the lesser offense only." The message sent to the jury was that if you find the defendant guilty of attempted second-degree murder you need not consider attempted voluntary manslaughter. Moreover, the attempted voluntary manslaughter instruction advised the jury: "If you do not find the defendant is guilty of attempted second-degree murder, you should then consider the lesser included offense of attempted voluntary manslaughter."

The attempted voluntary manslaughter instruction was clearly erroneous because it deprived Graham of the opportunity to have the jury consider mitigating circumstances which might have reduced attempted second-degree murder to attempted voluntary manslaughter. We are satisfied that there was a real possibility the jury would have rendered a different verdict had the jury been properly instructed on attempted voluntary manslaughter. We therefore reverse Graham's conviction for attempted second-degree murder and remand this case for further proceedings.

Graham also contends that the voluntary manslaughter instruction given was clearly erroneous because it did not instruct the jury that deadly force can be used if the defendant was under an unreasonable but honest belief that such force was needed. This issue, as well as other issues raised by Graham in his petition for review, were correctly and sufficiently addressed in the Court of Appeals' opinion.

Judgment of the Court of Appeals affirming the district court is reversed. The judgment of the district court is reversed, and the case is remanded.

ABBOTT and GERNON, JJ, not participating.

LARSON, S.J., and BRAZIL, S.J., assigned■