(203 P.3d 23)

No. 99,437

STATE OF KANSAS, *Appellee,* v. CHARLES CURTIS HUNTER, *Appellant.*

Opinion filed March 20, 2009.

*Lydia Krebs*, of Kansas Appellate Defender Office, for appellant.

*Douglas W. McNett*, assistant county attorney, and *Stephen N. Six*, attorney general, for appellee.

Before BUSER, P.J., ELLIOTT and GREEN, JJ.

GREEN, J.: Charles Hunter appeals from his jury trial conviction and sentence for battery of a law enforcement officer in violation of K.S.A. 21-3413(a)(3). First, Hunter contends that the trial court committed clear error based on the verdict form used in instructing the jury to consider Hunter's defense of his mental disease or defect. We disagree. Based on the record in this case and under our Supreme Court's decision in *State v. White*, 284 Kan. 333, 346-47, 161 P.3d 208 (2007), we find no clear error committed by the trial court in taking the verdict form in part directly from K.S.A. 22-3221.

Next, Hunter argues that the trial court violated his constitutional rights by not instructing the jury on the lesser included offense of battery. We again disagree. Because the evidence introduced at trial excluded a theory of guilt on the lesser included offense of battery, an instruction on battery would have been improper in this case. Finally, Hunter contends that the trial court erred in using his criminal history to increase his sentence. Nevertheless, Hunter concedes that this issue has been decided adversely to his position in *State v. Ivory*, 273 Kan. 44, 41 P.3d 781 (2002). Accordingly, we affirm.

Hunter has been incarcerated in various correctional facilities since 1978. When the incident occurred in this case, Hunter was incarcerated at Larned State Correctional Facility. Hunter had been diagnosed with schizophrenia paranoid type and had suffered for many years from delusions that the devil was after him. Hunter had also been diagnosed with antisocial personality disorder and had a history of violence during his incarceration. Before the incident, Hunter had taken several different medications for his mental health issues.

On the afternoon of March 23, 2005, Eric Fox, an activity therapist at Larned, was closing down activities for the day when Hunter took off his shoes and threw them in the equipment room. One of Hunter's shoes struck Fox in the leg. Fox asked Hunter to pick up his shoes, but Hunter would not move. When Corrections Officer Shannon Herdt saw what had happened, Herdt came down the hallway and asked Hunter several times to put away his shoes to no avail. Herdt then ordered Hunter to put away his shoes. Nevertheless, Hunter refused to comply with Herdt's order.

Corrections Officer Robert Witt, who was the yard officer that day, came inside, got close to Hunter, and told him that activities were over and that he needed to pick up his shoes. Hunter responded to Witt's request by calling him names. Witt testified that Hunter was in a provoked state and that he had never seen Hunter so angry. At that point, a call for officer assistance was made. Hunter removed his belt and hit Witt between his eyes with the metal end of his belt. Witt immediately began bleeding. Witt attempted to wipe the blood from his eyes and hold Hunter off of him, but Hunter was able to hit him several times on the side of his head. Witt fell to the floor, and Hunter tried to kick him in the head. Witt was able to block Hunter's kick with the back of his shoulder. The officers took Hunter to the ground. Hunter was handcuffed and taken immediately to the segregation unit.

Kimberly Ramsey was a corrections officer who delivered property to Hunter approximately 1 hour after the incident. According to Ramsey, Hunter was very calm and stated that he hoped he was taken downtown and charged for hitting Witt. Hunter told Ramsey

that he was tired of dealing with people at Larned and that he did not want it to end up as a disciplinary report.

Timothy Easley, an investigator at Larned, was in the segregation unit approximately 1 week after the incident when Hunter stopped him and asked to talk with him. Easley testified that Hunter stated that he threw his shoes on March 23, 2005, because he was angry that the activities department was closing. According to Easley, Hunter stated that he refused to pick up his shoes to show he was rebelling because the activities time had ended. Hunter told Easley that he became more and more angry and that he snapped when the call for officer assistance was made. Hunter further told Easley that he was working with the mental health staff on his anger issues.

Hunter was charged with battery of a law enforcement officer in violation of K.S.A. 2004 Supp. 21-3413(a)(2); see K.S.A. 21-3413(a)(3). The trial court entered an order for evaluation of competency and mental examination under K.S.A. 22-3219 and K.S.A. 22-3302. After the evaluation had been completed, the trial court found that Hunter was competent to stand trial.

Hunter's defense at trial was that he suffered from a mental disease or defect that rendered him incapable to form the requisite intent to commit the crime of battery of a law enforcement officer. Hunter testified at trial that before the March 23, 2005, incident, he was very paranoid because he thought that Satan was going to try to kill him because he had turned against Satan. When questioned further, Hunter explained as follows:

"[B]efore I came to prison, I was speaking to some witches and this smoke come down and they read my palm, it said I was the chosen one. And later on I went to a little park and sat on the merry-go-round and saw a little tiny man, of small stature talking to me and he made the merry-go-round go around and around and around. And I liked it turning. And we went up into the sky and the spirit and we started talking and I met God in such a way that I saw angels. He had no head, but I, you know, it was not a face, but actual[ly] a body and as he let me read a bible certain scriptures and things were actually happened as I was reading. For example, I saw a beast. And when I looked there was a beast coming up out of the top of the water, but to make a long story short, me and Satan was talking and he knew I was going to go to prison.

"So, he asked me what would my number be and I told him 37366. He mumbled real soft 666. I said no, 37366. So, they arranged for me to have a prison number and Satan read the scripture. And then there was a serpent and the

serpent said I would turn on him. Then I said what do you mean? He said it is going to turn on you. He said what's going to turn on me. I said I don't know. I didn't know.

"And later on I find out that before I went to prison, I read a scripture and as to when I left, in the end sayeth the Lord, and more on that day, in that moment if I was to turn over and over and over again. And should be no mortal till he comes. I would give him—he was talking about this situation in my life, like prison and so on and so forth."

Hunter testified that before the incident on March 23, 2005, he was having problems with "the devil" and with people that he sensed were the devil's "servants." Just before the incident, Fox had noticed that Hunter was walking rapidly around the activities square. According to Hunter, when he was pacing in the square just before the incident, he was having thoughts of the devil's force. Hunter testified that when Fox was talking to him about his shoes, he was talking to someone else in his head and could not understand what Fox and the officers wanted him to do. According to Hunter, when Witt appeared real close to him, he thought it was the devil. Moreover, when the call for officer assistance was made, he thought "they" were finally going to come get him, and so he took off his belt and tried to keep "him" back by using his belt. Hunter testified that he thought it was the devil coming at him and fighting him.

The day following the incident, Hunter wrote a letter in which he stated: "I am the one omen illuminati and I love you but I need to be appropriated. Sorry, but I am a god man a son of man." Hunter signed the letter: "To Wit: Kiss, the rock group Kiss, signed the Lord our righteousness. Dr. Rock." When asked what was "illuminati," Hunter explained that "[i]t has to do with the symbol on the back of a dollar, sometimes refer to that as the Eye of Ra, that's my birthmark and so on and so forth."

Jan Kolb is a mental professional who had worked with Hunter at Larned and had evaluated Hunter 4 hours after the March 23, 2005, incident. Kolb testified that before the incident happened on March 23, 2005, she had noticed that Hunter was beginning to struggle. In her written evaluation, Kolb wrote that Hunter had recently been acutely psychotic and had not returned to his pre-

vious level of functioning. Kolb also noted that Hunter appeared to be angry due to not being released by the parole board.

Psychologist William Albott evaluated Hunter on September 29, 2006, at Larned. At trial, Albott testified that in his professional opinion when the March 23, 2005, incident occurred, Hunter was functioning in an acute psychotic state. The evidence at trial showed that several days before the March 23, 2005, incident, one of Hunter's medications had been discontinued. Moreover, the dosage of one of Hunter's psychotropic medications had been doubled. The medication was increased because Hunter had been hearing voices, had been more delusional, and had experienced increased agitation. Albott testified that this medication change indicated that Hunter had been deteriorating for days preceding the incident.

Albott noted that there was a convergence of several things leading up to the March 23, 2005, incident, including the distress of his parole hearing, Hunter's deteriorating state, one of his medications being discontinued, and Hunter's lack of sleep. Albott testified that it took very little to push Hunter over the edge and that he had acted in a psychotic manner. Albott testified that all of the testimony he had heard and the evidence he had reviewed supported that Hunter had experienced a psychotic breakdown rather than a deliberate willful act on his part.

Kathy Spade testified that she had known Hunter for a long time and had worked on Hunter's unit at the Larned State Security Hospital in the 2 months leading up to the trial. Spade testified that Hunter was currently on 10 medications and that he was stabilized and functioning well. Moreover, Spade testified that Hunter had not exhibited any antisocial behavior. Nevertheless, Spade testified that even with all his medications, Hunter has a fixed delusional process that he discusses daily. Spade explained that Hunter equates many of life's events with good and evil and Satan and demonic delusions. According to Spade, when Hunter gets in a paranoid state, he equates people with demons and thinks that they are out to get him.

Dr. J.L.L. Fernando, a psychiatrist who conducted Hunter's evaluation at the Larned State Security Hospital in the last part of

2005, testified that, in his professional opinion, Hunter was not suffering from a mental defect when the March 23, 2005, incident occurred. Dr. Fernando explained in his evaluation report that "[a]lthough becoming angry and being of impaired judgment could be part of a schizophrenic process, there is no indication in the description of the incident Mr. Hunter behaved in a psychotic or demented manner although he may have had his judgment processes compensated." Dr. Fernando concluded that Hunter did not lack the required mental state as an element of the offense charged.

The jury found Hunter guilty of battery of a law enforcement officer. Hunter was sentenced to a prison term of 130 months, which was to run consecutive to the prison sentence he was currently serving. The trial court ordered Hunter to be committed to the Larned State Security Hospital for psychiatric care, treatment, and maintenance under K.S.A. 22-3430.

*I. Did the trial court err in instructing the jury on the verdict form?*

First, Hunter argues that the trial court committed clear error when it instructed the jury on the verdict form to refrain from considering his mental state during its deliberation on his guilt. Because Hunter did not object to the verdict form, this court applies a clearly erroneous standard. See K.S.A. 22-3414(3); *State v. Cooperwood*, 282 Kan. 572, 581, 147 P.3d 125 (2006). " 'Instructions are clearly erroneous only if the reviewing court is firmly convinced that there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred.' [Citations omitted.]" *State v. Carter*, 284 Kan. 312, 324, 160 P.3d 457 (2007).

Under K.S.A. 22-3220, mental disease or defect can be asserted as a defense to show that the defendant lacked the mental state required for the crime charged:

"It is a defense to a prosecution under any statute that the defendant, as a result of mental disease or defect, lacked the mental state required as an element of the offense charged. Mental disease or defect is not otherwise a defense. The provisions of this section shall be in force and take effect on and after January 1, 1996."

Thus, a defendant may raise a defense based on mental disease or defect "if the disease or defect was such that it could negate the

*mens rea* element of the crime." *State v. Bolden*, 28 Kan. App. 2d 879, 885, 24 P.3d 163, *rev. denied* 271 Kan. 1038 (2001). Here, Hunter's entire defense was based on the mental disease or defect defense.

The jury in this case was instructed concerning evidence of mental disease or defect as it related to the issue of whether Hunter was able to form the necessary intent to commit the charged crime. Instruction No. 5 provided:

"Evidence has been presented that the defendant was afflicted by mental disease or defect at the time of the alleged crime. Such evidence is to be considered only in determining whether the defendant had the state of mind required to commit the crime. You are instructed the defendant is not criminally responsible for his acts if because of mental disease or defect the defendant lacked the intent to engage in the conduct."

This instruction mirrors the language of PIK Crim. 3d 54.10.

In addition, Instruction No. 6 instructed the jury where Hunter would be committed if he was found not guilty based on his defense of mental disease or defect:

"If you find the defendant not guilty solely because the defendant at the time of the alleged crime, was suffering from mental disease or defect which rendered the defendant incapable of possessing the required criminal intent, then the defendant is committed to the State Security Hospital for safe-keeping and treatment until discharged according to law."

Instruction No. 6 mirrors the language of PIK Crim. 3d 54.10-A.

Although Instruction Nos. 5 and 6 properly instructed the jury on Hunter's defense of mental disease or defect, Hunter focuses on the verdict form that was given to the jury. The verdict form, provided as follows:

"We the jury find the defendant guilty of battery of a law enforcement officer.

_____
Presiding Juror

"We the jury find the defendant not guilty of battery of a law enforcement officer.

_____
Presiding Juror

"If your verdict was not guilty, please answer the following special question: Do you find the defendant not guilty solely because the defendant, at the time of

the alleged crime, was suffering from a mental disease or defect which rendered the defendant incapable of possessing the required criminal intent?

Yes _____ No _____

Presiding Juror"

This verdict form differs from that in the prior version of PIK Crim. 3d 68.06 (1996 Supp.), which recommended providing the following language to the jury concerning a not guilty verdict:

"We, the jury, find the defendant not guilty solely because the defendant, at the time of the crime, was suffering from a mental disease or defect which rendered the defendant incapable of possessing the intent required as an element of the crime.

Presiding Juror"

PIK Crim. 3d 68.06 (1996 Supp.) followed the language of PIK Crim. 3d 54.10 (Instruction No. 5 in this case) and made clear to the jury that the defendant is not guilty if it finds that the defendant was suffering from a mental disease or defect which rendered the defendant incapable of possessing the intent required for the charged crime.

Nevertheless, the 2007 supplement to PIK Crim. 3d 68.06 changed the recommended language in the verdict form to the exact same language that was provided to the jury on the verdict form in this case. Specifically, PIK Crim. 3d 68.06 (2007 Supp.) outlines the verdict form, when a defendant claims mental disease or defect, as follows:

"We, the jury, find the defendant guilty of _____.

Presiding Juror

"We, the jury, find the defendant not guilty of _____.

Presiding Juror

"If your verdict was not guilty, answer the following special question:

"Do you find the defendant was not guilty solely because the defendant, at the time of the alleged crime, was suffering from a mental disease or defect which rendered the defendant incapable of possessing the required criminal intent?

Yes _____ No _____

Presiding Juror"

In his appellate brief, Hunter fails to recognize the recently changed version of PIK Crim. 3d 68.06 (2007 Supp.). In accordance with PIK Crim. 3d 68.06 (2007 Supp.), the verdict form in this case focused the jury on Hunter's mental disease or defect defense if it found Hunter not guilty of the charged crime. Hunter maintains that the trial court's erroneous ordering of the options on the verdict form deprived the jury of the opportunity to consider his mental disease or defect while it was determining whether he was guilty of the charged crime. Hunter maintains that the State further compounded the problem by its comments during closing argument.

Specifically, towards the end of its closing argument, the prosecutor told the jury that it did not need to reach the second question unless it found him not guilty of the charged crime:

"Ladies and Gentlemen, the final thing I would like to point out to you, Ladies and Gentlemen, is the verdict form. It is some what unique. You haven't seen this yet,.but you're going to get it in a little bit.

"Ladies and Gentlemen, I want to point out to you, that you don't even need to get to the second part of that question. You know, you're asked the first question, did he do it or did he not do it. And only if you find that he did not do it, do you ever get to the second question. I would ask that you look at the form."

Hunter argues that the prosecutor's comments, along with the verdict form, essentially instructed the jury that it should not consider Hunter's mental state unless and until it found him not guilty of the crime charged. The structure of the prosecutor's closing argument and the verdict form used could be reconstructed into the following conditional syllogism:

If the jury finds the defendant *not guilty* of the crime charged (P), then it should consider whether the defendant was suffering from a mental disease or defect which rendered him incapable of possessing the required intent (Q).

If the jury finds the defendant *guilty* (not P),

Then, the jury *does not* have to consider whether the defendant was suffering from a mental disease or defect which rendered him incapable of possessing the required intent (not Q).

This conditional syllogism commits the classical fallacy known as denying the antecedent of a conditional statement. This fallacy is committed when a statement in the conditional form "if P, then

Q" is taken to imply "if not P, then not Q." This violates the rules of deduction. See Aldisert, Logic for Lawyers, pp. 160-63 (3d ed. 1997).

Although Hunter points out this fallacy, there are two problems with Hunter's argument—one based on precedent and one based on the record. *State v. White*, 284 Kan. 333, 346-47, 161 P.3d 208 (2007), controls the outcome of this case. In *White*, the jury had been given a special question nearly identical to the one given in the instant case. The special question was on the second page of the verdict form. The first page of the verdict form instructed the jury that it could find the defendant guilty of murder in the first degree, guilty of murder in the second degree, or not guilty. The appellant in *White* raised a similar argument to that raised here— that the trial court reversed the necessary inquiry and improperly instructed the jury on the verdict form that it only needed to consider mental disease or defect if it found the defendant "not guilty." Because the defendant in *White* did not object to the instructions or verdict form at trial, our Supreme Court applied a clearly erroneous standard of review. 284 Kan. at 346.

In addressing the appellant's argument, our Supreme Court in *White* looked to K.S.A. 22-3221, which requires a special question to be asked of the jury if it returns a "not guilty" verdict. K.S.A. 22-3221 provides as follows:

"In any case in which the defense has offered substantial evidence of a mental disease or defect excluding the mental state required as an element of the offense charged, and the jury returns a verdict of 'not guilty,' the jury shall also answer a special question in the following form: 'Do you find the defendant not guilty solely because the defendant, at the time of the alleged crime, was suffering from a mental disease or defect which rendered the defendant incapable of possessing the required criminal intent?' The provisions of this section shall be in force and take effect on and after January 1, 1996."

Our Supreme Court pointed out that the complained-of verdict form was taken directly from K.S.A. 22-3221. Noting that the jury had been properly instructed on mental disease or defect, our Supreme Court further stated:

"The jury was instructed about mental disease and defect and how that could result in its determination of not guilty. The jury was also instructed to decide on

guilt: if it found White not guilty, then it was instructed to designate whether it found him not guilty solely because of mental disease or defect, or not, *i.e.*, for some other, unspecified reason such as the prosecution failed to prove guilt beyond a reasonable doubt." 284 Kan. at 347.

Our Supreme Court held that the trial court did not err in taking its verdict form in part directly from K.S.A. 22-3221. 284 Kan. at 347.

Hunter maintains that this case is distinguishable from *White* due to the prosecutor's comments in closing arguments and the fact that the special question to the jury was on the same page as the jury's verdict. Nevertheless, the prosecutor was technically correct in telling the jury that it reached the second question on the verdict form only if it found Hunter not guilty of the charged crime. This is exactly what the special question, which was taken from K.S.A. 22-3221, instructed the jury to do: "If your verdict was not guilty, please answer the following special question . . . ."

Further, Hunter takes an isolated view of the prosecutor's comments. It was clear from the closing arguments of both the prosecutor and defense counsel that the central issue for the jury's determination was whether Hunter suffered from a mental disease or defect that rendered him incapable of possessing the intent to commit the charged crime. In closing arguments, the prosecutor specifically pointed the jury to the instruction regarding mental disease or defect and then proceeded to argue that it had proved that Hunter indeed had the requisite intent to commit the charged crime. In light of the fact that the jury had been specifically instructed on mental disease or defect in Instruction No. 5, there should have been no jury confusion by the prosecutor's comments.

Hunter attempts to compare this case to *State v. Graham*, 275 Kan. 831, 69 P.3d 563 (2003), and *State v. Cribbs*, 29 Kan. App. 2d 919, 34 P.3d 76 (2001). Those cases, however, are distinguishable. Both of those cases involved instructions on lesser included offenses. The verdict forms in *Graham* and *Cribbs* instructed each jury that if it did not find the defendant guilty of attempted second-degree murder, it should then consider the lesser included offense of attempted voluntary manslaughter. Essentially, the juries in *Graham* and *Cribbs* were both told that it did not need to consider

attempted voluntary manslaughter unless and until it agreed on whether the defendant was guilty of attempted second-degree murder. See *Graham*, 275 Kan. at 386-37; *Cribbs*, 29 Kan. App. 2d at 924. Different from both *Graham* and *Cribbs*, the jury in the present case was correctly instructed on the defense of mental disease and defect and how to use it in determining Hunter's guilt.

Finally, the fact that the special question was present on the same page as the jury's verdict does not change the result here. PIK Crim. 3d 58.06 (2007 Supp.) now contains the same format as that used here. Further, as in *White*, Hunter had no objection to the verdict form at trial. In fact, the trial judge specifically pointed out the special question to the jury on the verdict form and asked if defense counsel had any objection:

"THE COURT: Now, the other thing I want to address for the record, and I'm sure counsel is aware, and I know [the prosecutor] submitted a full set of instructions to the Court for review, is the verdict form.

"[Defense counsel:] I reviewed that with the [prosecutor], Your Honor, and we have no objection to that.

"THE COURT: I want to cover that with [the prosecutor] as well, because there is a P.I.K. instruction that—or actually a P.I.K. verdict form that is identified in P.I.K., but the problem is the statute which I believe to be controlling says that in the event a jury returns a verdict of not guilty then a special question must be responded to by the jury to the effect of do you find the Defendant not guilty solely because of mental defect or disease and the reason for that. Then that's a determination as to whether or not an individual goes to State Security Hospital.

"[Defense counsel:] I want that in there. I want that instruction in there.

"THE COURT: Okay. I'm talking about the verdict form.

"[Defense counsel:] Oh.

"THE COURT: It is the last page.

"[Defense counsel:] Okay.

"THE COURT: Do you have any objection to the verdict form?

"[Defense counsel:] No."

This colloquy between the trial judge and defense counsel demonstrates that the trial judge made a special effort to make defense counsel aware of the special question on the verdict form and that defense counsel had no objection. The special question to the jury on the verdict form came directly from K.S.A. 22-3221. Further, just like the facts of *White*, the record demonstrates that the jury was accurately instructed about mental disease and defect and how

that could result in its determination of not guilty (Instruction No. 5). Under *White,* there was no clear error committed by the trial court in taking its verdict form in part directly from K.S.A. 22-3221. See *White,* 284 Kan. at 346-47.

Moreover, as stated earlier, the trial court specifically asked defense counsel if he had "any objection to the verdict form?" Defense counsel said, "No." Because Hunter told the trial court that he had no objection to the verdict form when the trial court brought the matter to his attention, Hunter actively contributed to what he now asserts was trial error. His action is akin to the doctrine of invited error. "A litigant may not invite and lead a trial court into error and then complain of the trial court's action on appeal." *Hebert,* 277 Kan. at 78. As a result, Hunter's argument fails.

*II. Did the trial court violate Hunter's constitutional rights by not instructing the jury on the lesser included offense of battery?*

Next, Hunter contends that the trial court violated his right to a jury trial under the Sixth Amendment to the United States Constitution and his right to due process under the Fifth and Fourteenth Amendments to the United States Constitution by failing to instruct the jury on the lesser included offense of battery.

Because Hunter never requested an instruction on battery, this court reviews for clear error. See K.S.A. 22-3414(3); *State v. Engelhardt,* 280 Kan. 113, 134, 119 P.3d 1148 (2005). When the defendant fails to request a lesser included offense instruction, the failure to give the instruction "is clearly erroneous only if the appellate court reaches a firm conviction that, had the instruction been given, there was a real possibility the jury would have returned a different verdict. [Citation omitted.]" *State v. Simmons,* 282 Kan. 728, 741, 148 P.3d 525 (2006).

With the exception of a felony-murder case, a criminal defendant has a right to an instruction on all lesser included offenses supported by the evidence at trial as long as (1) the evidence, when viewed in the light most favorable to the defendant's theory, would justify a jury verdict in accord with the defendant's theory and (2) the evidence at trial does not exclude a theory of guilt on any lesser

offense. If, however, from the evidence the jury could not have reasonably convicted the accused of the lesser offense, then an instruction on a lesser included offense is not proper. *Simmons*, 282 Kan. at 741-42.

A lesser included offense is "a crime where all elements of the lesser crime are identical to some of the elements of the crime charged." K.S.A. 21-3107(2)(b). K.S.A. 21-3413(a)(3) requires the State to prove a battery under K.S.A. 21-3412 in order for the defendant to be convicted of battery of a correctional officer. The additional requirements to prove battery of a correctional officer are that the State must show that the battery was committed against "[a] state correctional officer or employee by a person in custody of the secretary of corrections, which such officer or employee is engaged in the performance of such officer's or employee's duty." K.S.A. 21-3413(a)(3)(A).

Hunter's argument on this issue is similar to that presented in *State v. Trujillo*, 225 Kan. 320, 590 P.2d 1027 (1979). There, the trial court instructed the jury on battery of a law enforcement officer under K.S.A. 21-3413 (Weeks). The appellant argued that the jury should also have been instructed on the lesser included offense of battery under K.S.A. 21-3412 (Weeks). Nevertheless, our Supreme Court stated that there was no issue raised at the trial concerning the victim's identification as a police officer. The victim had been in uniform and had identified himself to the appellant. Our Supreme Court recited the familiar rule that "[a] trial court is not required to instruct on a lesser offense of the crime charged if the evidence at the trial excludes a theory of guilt on the lesser offense. [Citations omitted.]" 225 Kan. at 322. As a result, our Supreme Court found no error in the trial court's failure to instruct on the lesser included offense of battery. 225 Kan. at 322; see also *State v. Whiters*, No. 89,631, unpublished opinion filed November 7, 2003 (where evidence at trial excluded appellant of being found guilty of only battery, no error in failing to instruct on lesser included offense of battery).

In this case, there was no issue raised at trial concerning Witt's status as a correctional officer engaged in the performance of his duties when he was hit by Hunter. The evidence showed that Witt

was a correctional officer at Larned. Hunter was incarcerated at Larned when the incident occurred. Witt was on duty on March 23, 2005, and was engaged in the performance of his duties when he was hit by Hunter. Because the evidence at trial excluded a theory of guilt on the lesser included offense of battery, an instruction on battery would not have been proper in this case. As a result, Hunter's argument on this issue fails.

III. *Did the trial court err in using Hunter's criminal history to increase his sentence?*

Finally, Hunter argues that the trial court violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution under *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), when it used his criminal history that had not been put before a jury and proven beyond a reasonable doubt to increase his sentence. Hunter concedes that this issue is controlled by our Supreme Court's decision in *State v. Ivory*, 273 Kan. 44, 41 P.3d 781 (2002). This court is duty bound to follow Kansas Supreme Court precedent, absent some indication the court is departing from its previous position. *State v. Singleton*, 33 Kan. App. 2d 478, 488, 104 P.3d 424 (2005). Because our Supreme Court has consistently followed its position in *Ivory*, we are unable to grant relief to Hunter on this issue. See *State v. Fewell*, 286 Kan. 370, 394-96, 184 P.3d 903 (2008).

Affirmed.